# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-13-00189-CV

**Hunt County Community Supervision and Corrections Department, Appellant**

**v.**

**Christina Gaston, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
### NO. D-1-GN-11-003857, HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

## O P I N I O N

We withdraw our opinion, dissenting opinion, and judgment dated August 6, 2014, and substitute the following in their place. We overrule the motion for rehearing filed by appellee, Christina Gaston.

This is an appeal of a trial court order denying a plea to the jurisdiction in a Whistleblower suit. The key issue presented is whether, for purposes of the Whistleblower Act's waiver of sovereign and governmental immunity, a state district judge was an "appropriate law enforcement authority" to whom alleged "violations of law" could be "reported." We conclude that the district judge was not, at least under the circumstances presented here. This holding requires us to reverse the order challenged on appeal and dismiss the suit for want of subject-matter jurisdiction.

## BACKGROUND

The Whistleblower claimant and appellee, Gaston, was formerly employed as a "community supervision officer" with the defendant and appellant, the Hunt County Community Supervision and Corrections Department (HCCSCD)—in common parlance, a probation officer with Hunt County's local adult probation department.[1] As their names and titles suggest, officers like Gaston and departments like HCCSCD assist trial courts in the administration of "community supervision"—a/k/a "probation"—the familiar corrective and rehabilitative regime that trial judges may impose on criminal defendants as an alternative to incarceration.[2] Primary duties of such officers include day-to-day implementation, enforcement, and monitoring of probationers' compliance with the court-ordered "terms and conditions" that are a defining feature of community supervision—e.g., obeying the law, holding a steady job, submitting to alcohol or drug testing, and reporting regularly to an assigned probation officer—and providing information to the sentencing courts to whom the probationers ultimately must give account.[3] In the case of Gaston, whose

---

[1] Hunt County is located about fifty miles northeast of Dallas. Its county seat is Greenville. This appeal comes to this Court (whose 24-county district, while large, does not extend quite so far northward) under color of the Whistleblower Act's venue provision, which permits claims under the Act against "a state governmental entity" to be brought in a Travis County district court. *See* Tex. Gov't Code § 554.007(a). As we subsequently explain, it is unclear whether HCCSCD is properly considered a "state governmental entity" as opposed to a "local governmental entity" under the Act, *see infra* note 45, but HCCSCD has not preserved any complaint about the Travis County venue.

[2] Although "community supervision" is currently the correct statutory term for the regime (and the same is true of "community supervision officer," "community supervision department," "under community supervision," etc.), we will at times substitute "probation" or "probationer" in the interest of brevity.

[3] *See* Tex. Gov't Code §§ 76.001(2), (4), .004(b); *see generally* Tex. Code Crim. Proc. art. 42.12.

2

tenure with HCCSCD lasted approximately thirteen years, she worked initially in the day-to-day supervision of probationers. However, beginning in roughly 2006, Gaston was assigned to serve as the department's designated "court officer" in Hunt County felony cases, essentially a representative or spokesperson for the department in court proceedings involving probationers who were being supervised by other officers. In this role, Gaston's work was primarily at the district court level.

Community supervision and corrections departments (CSCDs) serve the district courts and county courts at law handling criminal cases within a designated judicial district or combination of districts.[4] CSCDs are established by, and operate under the oversight of, a committee or board comprised of the presiding judges of the courts served by the district.[5] That oversight includes approving the CSCD's annual budget and a "community justice plan" (essentially a policy or strategic planning document to help guide the department's programming and other operations), as well as appointing "a department director," who is charged with the department's day-to-day administration.[6] Among other duties, the director "shall employ a sufficient number of officers and other employees to conduct presentence investigations, supervise and rehabilitate defendants placed on community supervision, enforce the conditions of community supervision, and staff community corrections facilities."[7] Although these subordinates are integral to judicial administration of community supervision regimes, the Legislature has prescribed that CSCDs are

---

[4] *See* Tex. Gov't Code § 76.002.

[5] *See id*. §§ 76.002, .003, .004, .0045.

[6] *See id*. §§ 76.002(a)(2), .003, .004(a), (a-1).

[7] *Id*. § 76.004(b).

3

entities distinct from the courts they serve, albeit still within the Judicial Branch,[8] and that each subordinate "is an employee of the department and not of the judges or judicial districts."[9] It has similarly provided that the CSCD director possesses the sole direct authority over hiring subordinates and that the overseeing judges' "responsibility . . . for personnel decisions" in this regard "is limited to the appointment of [the] department director" only.[10]

In the case of the HCCSCD, it is overseen by the presiding judges of four Hunt County trial courts that handle criminal cases—the 354th District Court, which serves a multi-county district that includes Hunt County; the 196th District Court, which serves Hunt County only; plus two county courts at law. At all relevant times, HCCSCD's director—and, thus, Gaston's boss—was Jim McKenzie.

In January 2011, a new judge assumed the 196th District Court bench—the Hon. Stephen Tittle, a former local prosecutor who had unseated a longtime incumbent in the 2010 General Election. Although the record hints at a more intricate web of personality differences and local political tensions fueling the disputes that would give rise to this proceeding, both parties' theories of the case center on the undisputed facts that Gaston and Tittle had formed a personal friendship during Tittle's days as a prosecutor[11] and that this relationship or alliance had continued

---

[8] As indicated by the Legislature's placement of the statute governing the structure and governance of CSCDs, chapter 76 of the Government Code, within Title 2, "Judicial Branch."

[9] *Id*.

[10] *Id*. §§ 76.004(a), .045(a).

[11] Gaston also described herself as a "supporter" of Tittle's judicial bid.

as Gaston served as HCCSCD's chief representative in the courtroom over which the newly minted Judge Tittle now presided.

According to HCCSCD, Gaston somewhat egotistically fancied herself as wielding influence over Judge Tittle's official actions by virtue of her friendship and access to him, touted that perception to department colleagues and others, and sought to wield her self-perceived powers to achieve her personal ends. After McKenzie allegedly received internal complaints of such conduct from some of Gaston's HCCSCD colleagues, he initiated an internal investigation that purportedly revealed, among other misconduct, that Gaston had threatened to punish a criminal defense attorney who had angered her by influencing Judge Tittle to cease giving the attorney court appointments. Citing these alleged acts and various other complaints about Gaston's professional conduct,[12] McKenzie terminated Gaston on October 6, 2011.

Gaston contends that she was actually terminated because she had divulged to Judge Tittle that McKenzie and other HCCSCD personnel had engaged in what she viewed as illegal conduct in their administration and enforcement of community service requirements that probationers had been ordered to complete as part of the terms and conditions of their community supervision. When imposing community supervision, judges are authorized (and, prior to 2007, were obligated) to "require as a condition of community supervision that the defendant work a specified number of hours at a community service project or projects for an organization or

---

[12] E.g., Gaston's supposed undermining of her "chain of command" by using "false" information to induce Judge Tittle to intervene in HCCSCD matters on her behalf.

5

organizations approved by the judge and designated by the [community supervision] department."[13]

Accordingly, the Hunt County criminal trial courts, including the 196th District Court, had imposed such conditions (also known as "community service restitution" or "CSR") on a number of probationers. The nature and potential significance of Gaston's purported revelations to Judge Tittle concerning CSR practices are best understood in the context of a series of related issues that Tittle himself had raised with the other judges who oversaw HCCSCD and McKenzie during the summer of 2011.

By July 2011, Judge Tittle had ascertained that several of the local nonprofit "contract agencies" that provided community-service opportunities for Hunt County probationers had been accepting monetary donations from probationers in exchange for credited hours the probationers would receive against their court-ordered CSR requirements. At least in some instances, the judges of the sentencing courts, including Judge Tittle, had been unaware of the substitution because they had been informed only that the probationers had satisfied the requisite number of hours without revealing that the hours had been "bought" from the contract agencies rather than actually worked. Tittle also learned that contract agencies even had a specified "price" per hour of CSR credit and that the most prolific recipient of these donations from probationers—the local YMCA—had been "charging" less per hour of CSR credit than other nonprofits. It is also of some significance to Gaston's theory of the case that the YMCA's board members included another Hunt County criminal-court judge who, according to Gaston, was a friend or ally of McKenzie.

---

[13] Tex. Code Crim. Proc. art. 42.12, § 16(a); *see* Tex. Att'y Gen. Op. No. GA-0593, at 3 (2008) (discussing recent history of statutes relating to community service as a condition of community supervision).

6

Judge Tittle expressed concern to McKenzie and to the other judges who supervised HCCSCD that the awarding of CSR credit to probationers in exchange for monetary donations violated article 42.12 of the Code of Criminal Procedure, the chief statute governing the imposition and enforcement of community supervision.[14] Although article 42.12 generally vests broad discretion in trial judges to impose or modify "terms and conditions" of community supervision, permitting any "reasonable condition that is designed to protect or restore the community [or] victim, or punish, rehabilitate, or reform the defendant,"[15] the statute prohibits judges from "order[ing] a defendant to make any payments as a term or condition of community supervision, except for fines, court costs, restitution to the victim, and other conditions related personally to the rehabilitation of the defendant or otherwise expressly authorized by law."[16] In a 2008 opinion, GA-0593, the Attorney General had concluded that these features of article 42.12 generally limit the discretion of trial judges to require or permit a probationer to satisfy community-service requirements through donations of money or goods in lieu of actual work solely to instances where the donation would independently be permissible as a "fine, court costs, restitution to the victim," or "relat[e] personally to the rehabilitation of the defendant."[17] However, the Attorney General explained, an exception to this limitation is provided by section 16(f) of article 42.12, whereby judges, "[i]n lieu of requiring a defendant to work a specified number of hours at a

_____

[14] *See generally* Tex. Code Crim. Proc. art. 42.12.

[15] *Id*. art. 42.12, § 11(a).

[16] *Id*. art. 42.12, § 11(b).

[17] *See* Tex. Att'y Gen. Op. No. GA-0593, at 5-7.

7

community service project or projects . . . may order a defendant to make a specified donation to a nonprofit food bank or food pantry in the community in which the defendant resides."[18] Relying on these authorities, Tittle concluded that to the extent Hunt County probationers were being allowed to obtain CSR credit through donations to nonprofits other than food banks or pantries, the practice violated article 42.12 in the absence of a court order expressly tying such donations to the probationer's rehabilitation. Accordingly, on July 18, during a court proceeding at which Gaston was present, Judge Tittle refused to award CSR credit to a probationer who had attempted to "buy" the hours through a donation to the YMCA, and indicated that he would rule similarly in future cases.[19] Subsequently, during an August 30, 2011 meeting, Tittle prevailed upon the other three judges who oversee HCCSCD to implement what McKenzie later described as a "CSR policy change"—probationers could opt to make donations in lieu of working CSR only to "approved food banks or pantries."

As reflected in e-mail correspondence included in the record, McKenzie was, at least initially, somewhat resistant to Judge Tittle's concerns about the donation-for-CSR-credit practices, cautioning Tittle that ending the practice would be detrimental to "a lot of the CSR contract

---

[18] *Id*. (citing Tex. Code Crim. Proc. art. 42.12, § 16(f)).

[19] Gaston made note of this decision and her understanding of Judge Tittle's reasoning in HCCSCD records:

> The Judge ordered NO CSR to be paid and [the probationer] will NOT receive credit for any bought CSR hours. . . . [Probationer] asked me about CSR. I told him he may not pay for CSR but must work for CSR, he asked about hours already donated[.] I told him the Judge told him he will not get CSR credit for buying hours as not legal. He asked what about money he already paid, I advised him he needs to take that up with YMCA. . . . I told him the Judge ordered NO payment for CSR unless food pantry and such is illegal.

8

agencies," who "are small . . . [and] have started to rely on these donations to make ends meet." McKenzie also attempted to deny or downplay the involvement of HCCSCD personnel or himself individually in the practices, insinuating that the nonprofits had acted unilaterally in accepting the donations and then reporting to the department (and, in turn, the courts) merely that the CSR hours had been satisfied without revealing they had been "bought" rather than worked.[20] It is in this context that Gaston claims she divulged to Judge Tittle, in a series of out-of-court conversations during the spring and summer of 2011, that HCCSCD personnel, with McKenzie's initial approval, had directly engaged in a variant of the donation-for-CSR-credit scheme that arguably benefitted those employees personally.

The underlying events that Gaston allegedly reported to Judge Tittle are largely undisputed and confirmed by evidence that includes copies of e-mails from McKenzie himself. In early 2011, HCCSCD personnel, with McKenzie's approval, launched an initiative—heralded by signs in the department's offices—in which probation officers solicited donations of money and sports equipment from probationers in exchange for credit against the probationers' court-ordered CSR hours. The purpose of this donation drive was to equip an exercise facility at the Hunt County sheriff's office to which HCCSCD personnel would have access—their own private health club, as Gaston saw it. McKenzie ended this initiative in mid-February 2011 (around the same time Gaston claims she first informed Judge Tittle about the initiative), advising in an e-mail to subordinates (but

---

[20] Similarly, in an e-mail to Judge Tittle, McKenzie contrasted this nonprofit-driven practice that he portrayed with one in which HCCSCD itself "had been or starts allowing probationers to make payments to the department in lieu of performing CSR." In *that* situation with direct HCCSCD involvement in the scheme, McKenzie acknowledged, "we would be in violation" of article 42.12 as construed by the Attorney General in GA-0593.

excluding Gaston) that "after giving it some thought I don't think it's appropriate."[21] By this time, however, the initiative had already yielded equipment that had been placed in the exercise facility. McKenzie ultimately had this equipment removed from the sheriff's office and re-donated to the YMCA—yet another benefit for this favored local nonprofit, Gaston suggests.

Although Gaston claims she divulged these activities to Judge Tittle as early as the spring of 2011 and again following the July 18 proceeding in which Tittle had refused CSR credits for the probationer who had "bought" hours at the YMCA, there is no allegation or evidence that Tittle raised them with McKenzie or the other judges who supervised HCCSCD anytime before October 3, 2011. On that day, Judge Tittle received a letter from McKenzie advising the four supervising judges about his internal investigation of Gaston. Later that day, Tittle e-mailed McKenzie demanding that the director inform him "of which 196th [District Court] probationers you allowed to buy off their community service hours . . . [and] under what authority you allowed it in the first place." "In addition to that shocking information," Tittle continued, "I was also informed that you had actually allowed probationers to make cash donations to your office to buy off their community service hours and that then you took that money, purchased exercise equipment, and then gave it to someone you know," which one could infer was a reference to McKenzie's relationship to the YMCA and its board. By e-mail the same afternoon and a letter the following day, both addressed to all four of the judges who oversee HCCSCD, McKenzie decried Tittle's "criminal implications" of him relating to the exercise equipment and denied them at length. McKenzie also pointedly noted the "coincidence" that Tittle's "new information that accuses me of committing a

---

[21] McKenzie added, "Please remove the signs from your doors immediately."

10

criminal act is being brought to my attention on the very same day I informed the Courts about the investigation involving Ms. Gaston" and added that "[i]f an employee of mine is responsible for making this false claim about me to Judge Tittle, that most certainly would warrant an immediate termination from the Department."

The Whistleblower Act (chapter 554 of the Government Code[22]) is violated "when a governmental entity retaliates against a public employee for making a good-faith report of a violation of law to an appropriate law enforcement authority."[23] Contending that she was the victim of this sort of retaliation for having "reported" her colleagues' "violations of law" to Judge Tittle, Gaston sued HCCSCD under the Act, seeking monetary and equitable remedies the Act provides for violations.[24] To invoke the district court's jurisdiction over her claims against HCCSCD, Gaston relied on the Act's waiver of sovereign and governmental immunity, which authorizes "[a] public employee who alleges a violation of this chapter [to] sue the employing state or local governmental entity for the relief provided by this chapter" and further waives the entity's immunity from liability to the extent of such relief.[25] HCCSCD interposed a plea to the jurisdiction, relying chiefly on evidence that purported to negate any allegation by Gaston of "a violation of this chapter." Gaston responded with her own jurisdictional evidence.[26] Following a hearing at which no additional

---

[22] *See generally* Tex. Gov't Code §§ 554.001-.010.

[23] *State v. Lueck*, 290 S.W.3d 876, 878 (Tex. 2009) (citing Tex. Gov't Code § 554.002(a)).

[24] *See* Tex. Gov't Code § 554.003. There is no dispute that Gaston satisfied the Act's exhaustion-of-remedies requirement beforehand. *See id*. § 554.006.

[25] *See id*. § 554.0035.

[26] In addition to evidence the parties specifically addressed to the jurisdictional issue, the district court also had before it evidence the parties presented in support of cross-motions for

evidence was presented, the district court denied HCCSCD's plea without elaboration as to its grounds, and no findings of fact and conclusions of law were requested or made. HCCSCD then timely perfected this appeal from the district court's order.[27]

## ANALYSIS

It is now well established, and the parties agree, that in order to invoke the Whistleblower Act's waiver of immunity, Gaston was required to affirmatively demonstrate facts that would be sufficient to establish (1) that she was a "public employee" as defined by the Act; and (2) each element of the cause of action the Act provides.[28] The latter requires Gaston to present facts that would demonstrate:

(1)     the information she divulged to Judge Tittle constituted "good faith" "reports" of one or more "violations of law" by the "employing governmental entity" or "another public employee";

(2)     Judge Tittle was an "appropriate law enforcement authority" to whom Gaston could make these "reports"; and

(3)     Gaston's "reports" to Judge Tittle caused HCCSCD to fire her.[29]

---

summary judgment regarding the merits of certain claims and defenses. This summary-judgment evidence is materially identical to the expressly jurisdictional evidence, however.

[27]  *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8).

[28]  *See* Tex. Gov't Code §§ 554.002, .0035; *Canutillo Indep. Sch. Dist. v. Farran*, 409 S.W.3d 653, 656 (Tex. 2013) (per curiam) (citing *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000)); *City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625-28 (Tex. 2010) (per curiam); *Lueck*, 290 S.W.3d at 881-84.

[29]  *See* Tex. Gov't Code § 554.002; *Farran*, 409 S.W.3d at 656 (citing *Zimlich*, 29 S.W.3d at 67); *City of Elsa*, 325 S.W.3d at 625-28; *Lueck*, 290 S.W.3d at 881-84.

12

**Standard of review**

To determine whether Gaston has affirmatively demonstrated these required jurisdictional facts, we begin with the allegations set forth in her live pleadings, which we construe liberally in favor of jurisdiction and take as true in the first instance.[30] We also consider the evidence relevant to jurisdiction.[31] We are to take Gaston's evidence as true and indulge all reasonable inferences in her favor.[32] Further, only conclusive contrary evidence is sufficient to negate the existence of a jurisdictional fact that Gaston has pled.[33] Consequently, while HCCSCD vigorously contests numerous factual assertions made by Gaston, we must give considerable deference to her side of the story for purposes of this appeal—which, again, focuses on jurisdiction, not the merits of the parties' contentions.[34] The ultimate inquiry of whether the un-negated facts presented by

---

[30] *See City of Elsa*, 325 S.W.3d at 625; *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226-28 (Tex. 2004).

[31] *See City of Elsa*, 325 S.W.3d at 625-26; *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

[32] *See Miranda*, 133 S.W.3d at 228; *accord Farran*, 409 S.W.3d at 656.

[33] We defer to Gaston's pleadings and evidence in this manner, which resembles the analysis of a traditional summary-judgment motion, because these material jurisdictional facts overlap with the merits of Gaston's Whistleblower claims. *See Lueck*, 290 S.W.3d at 881-84; *Miranda*, 133 S.W.3d at 227-28; *see also University of Tex. v. Poindexter*, 306 S.W.3d 798, 806-07 (Tex. App.—Austin 2009, no pet.) (explaining differences in standards of review for evidence-based challenges to jurisdictional facts that implicate the merits versus those that do not).

[34] Similarly, our references to material asserted facts should be understood in this analytical context and not as a comment on their ultimate validity or truth.

Gaston affirmatively demonstrate each of the challenged jurisdictional elements is one of law that we review de novo.[35]

This jurisdictional analysis also requires us to construe the Whistleblower Act's provisions that bear upon its waiver of immunity. We review questions of statutory construction de novo.[36] Our primary objective in statutory construction is to give effect to the Legislature's intent.[37] To discern that intent we begin with the statute's words.[38] We are to consider the statute as a whole, interpreting it to give effect to every part.[39] "The plain meaning of the text, given the context of the statute as a whole, provides the best expression of legislative intent."[40] "We presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen."[41]

---

[35] *City of Elsa*, 325 S.W.3d at 625; *see Miranda*, 133 S.W.3d at 226-27; *Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 516 (Tex. App.—Austin 2010, no pet.).

[36] *See City of Houston v. Bates*, 406 S.W.3d 539, 543-44 (Tex. 2013).

[37] *Id*.

[38] *See TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) (citing Tex. Gov't Code § 312.003).

[39] *City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 641 (Tex. 2013).

[40] *See Liberty Mut. Ins. Co. v. Adcock*, 412 S.W.3d 492, 494 (Tex. 2013); *see also TGS–NOPEC*, 340 S.W.3d at 441 ("It is a fundamental principle of statutory construction and indeed of language itself that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used.").

[41] *See TGS–NOPEC*, 340 S.W.3d at 441; *see also In re Allen*, 366 S.W.3d 696, 706 (Tex. 2012) (orig. proceeding) ("'A statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it.'" (quoting *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990))).

14

Although the Legislature did not expressly say so in the Whistleblower Act, this Court and various of our sister courts have previously inferred that the Act should be "liberally construed" in light of its "remedial" goal of enhancing openness and legal compliance in government.[42] This concept is seemingly the lodestar of the dissent's construction of the Act. But whatever utility this concept might have in guiding the Act's other applications, the Texas Supreme Court has recently emphasized that, as with other statutes, the Act "'shall not be construed as a waiver of immunity unless the waiver is effected by clear and unambiguous language.'"[43] The high court has likewise reminded us that it is the Legislature's sole prerogative as to whether, how, or to what extent to waive immunity under the Act and that both this principle and the immunity doctrines themselves are founded on judicial deference to legislative policy judgments regarding the appropriate use of Texas's governmental resources.[44] In short, our analytical starting point is that immunity bars Gaston's suit against HCCSCD, and whether it should be otherwise turns not on the Act's

---

[42] *See, e.g.*, *Texas Dep't of Criminal Justice v. McElyea*, 239 S.W.3d 842, 849 (Tex. App.—Austin 2007, pet. denied); *Scott v. Godwin*, 147 S.W.3d 609, 622 (Tex. App.—Corpus Christi 2004, no pet.).

[43] *Lueck*, 290 S.W.3d at 880 (quoting Tex. Gov't Code § 311.034).

[44] *See id.*; *see also, e.g.*, *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 695 (Tex. 2003) (noting that the "Legislature is better suited to balance the conflicting policy issues associated with waiving immunity"); *Bacon v. Texas Historical Comm'n*, 411 S.W.3d 161, 173 (Tex. App.—Austin 2013, no pet.) ("This principle of judicial deference embodied in sovereign immunity extends not only to the Legislature's choices as to whether state funds should be spent on litigation and court judgments versus other priorities, but equally to the policy judgments embodied in the constitutional or statutory delegations that define the parameters of an officer's discretionary authority and the decisions the officer makes within the scope of that authority." (citing *Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011) (per curiam) (citing *W.D. Haden Co. v. Dodgen*, 308 S.W.2d 838, 839 (Tex. 1958)); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009); *Director of Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.*, 600 S.W.2d 264, 265 (Tex. 1980))).

15

overarching policy goals, however salutary judges may perceive them to be, but solely on whether the Legislature has clearly and unambiguously waived immunity with respect to the facts Gaston has presented.

**Appropriate law enforcement authority?**

HCCSCD has not contested that Gaston was a "public employee" at relevant times and thereby satisfies the first jurisdictional element of her Whistleblower claim, and we see no reason to disagree with that ultimate conclusion.[45] HCCSCD instead challenges whether Gaston

---

[45] *See City of Elsa*, 325 S.W.3d 627 n.4 (examining sua sponte whether Whistleblower claimant satisfied element not challenged by the defendant, as the issue went to jurisdiction). But while we agree with the ultimate conclusion that Gaston satisfies the "public employee" element, precisely why she does so is unclear. A "public employee" under the Whistleblower Act "means an employee or appointed officer other than an independent contractor who is paid to perform services for a state or local governmental entity." Tex. Gov't Code § 554.001(4). In her live petition, Gaston alleges, and the evidence conclusively establishes, that she was an employee of HCCSCD and was paid to perform services for that entity, so the issue becomes whether HCCSCD is either a "state or local governmental entity." The Act defines a "state governmental entity" to mean:

(A)    [A] board, commission, department, office, or other agency in the executive branch of state government, created under the constitution or a statute of the state, including an institution of higher education, as defined by Section 61.003, Education Code;

(B)    the legislature or a legislative agency; or

(C)    the Texas Supreme Court, the Texas Court of Criminal Appeals, a court of appeals, a state judicial agency, or the State Bar of Texas.

*Id.* § 554.001(5). Gaston pleads that HCCSCD is "a state governmental entity as defined by Gov. Code Ann. § 554.001(5)(C)"—paragraph (C) of the above-quoted definition—evidently in the view that the department is a "state judicial agency," the sole component of paragraph (C) that could conceivably apply to that entity. The Legislature did not define "state judicial agency" as used in the Whistleblower Act. Applying the ordinary meaning of these terms, a CSCD would possess features of an "agency," which, generally speaking, refers in the governmental context to some sort of entity or instrumentality exercising delegated authority over a particular activity or area. *See Webster's*

16

met her burden as to each of the three elements of her Whistleblower cause of action. Its most substantial challenge—and one we find dispositive—concerns whether Judge Tittle sufficed as an "appropriate law enforcement authority" with respect to Gaston's "reports" of asserted "violations of law." We will thus begin (and, ultimately, end) our analysis there.[46]

*Third New Int'l Dictionary* 40 (2002) ("agency" includes "a department or other administrative unit of a government"); *see also Black's Law Dictionary* 71 (9th ed. 2009) ("agency" includes "[a] governmental body with the authority to implement and administer particular legislation"). HCCSCD would likewise be "judicial" to the extent it is within the Judicial Branch and exercises delegated powers in aid of the judiciary. However, it is less clear whether a CSCD would be considered a "*state* judicial agency." Although a CSCD serves one or more state judicial districts and is overseen by one or more district court judges, it is an entity distinct from the judicial district and courts, as previously explained, and the Legislature has further specified that department employees are generally not considered to be "state employees." *See* Tex. Gov't Code § 76.006. In fact, in various other statutory contexts, CSCDs have been characterized instead as "special purpose districts," a form of local rather than state government. *See De Santiago v. West Tex. Cmty. Supervision & Corr. Dep't*, 203 S.W.3d 387, 394 (Tex. App.—El Paso 2006, no pet.); Tex. Att'y Gen. Op. No. DM-395 (1996). But even if CSCDs are properly considered "special purpose districts" rather than "state judicial agencies" for purposes of the Whistleblower Act, this would bring them squarely within the Act's definition of "local government entity":

> [A] political subdivision of the state, including a:
>
> (A)    county;
>
> (B)    municipality;
>
> (C)    public school district; or
>
> (D)    *special-purpose district or authority*.

Tex. Gov't Code § 554.001(2) (emphasis added). In short, we need not decide whether HCCSCD is properly classified as a "state judicial agency" versus a "special-purpose district or authority" or other "local governmental entity" because it seems clear to us that the department would come within at least one of these definitions. In either case, Gaston satisfies the "public employee" jurisdictional element.

    [46]  *See* Tex. R. App. P. 47.1.

17

At relevant times, the Legislature has provided the following definition or description of an "appropriate law enforcement authority" under the Whistleblower Act:

> [A] report is made to an appropriate law enforcement authority if the authority is a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to:
>
> (1)  regulate under or enforce the law alleged to be violated in the report; or
>
> (2)  investigate or prosecute a violation of criminal law.[47]

The definition focuses on: (1) the claimant's "good faith" belief regarding (2) the attributes of the governmental entity that the reported-to "authority" is "part of," as opposed to "the specific individual to whom the report is made."[48]  The relevant governmental entity that Judge Tittle is "part of" is the 196th District Court.[49]  HCCSCD has not disputed that the 196th District Court is "a state or local governmental entity,"[50] and we will assume (as it is ultimately unnecessary for us to decide) that it is.[51]

---

[47]  Tex. Gov't Code § 554.002(b).

[48]  *Robertson Cnty. v. Wymola*, 17 S.W.3d 334, 340 (Tex. App.—Austin 2000, pet. denied); *see University of Tex. Sw. Med. Ctr. v. Gentilello*, 398 S.W.3d 680, 686 (Tex. 2013).

[49]  *See* Tex. Gov't Code § 24.375 (creating the 196th Judicial District); *see also* Tex. Const. art. V, § 7.

[50]  The 196th District Court is unquestionably not "part of . . . the federal government" in any relevant respect, so jurisdiction would hinge on whether it is "part of a state or local governmental entity."

[51]  However, we note that the Whistleblower Act is less than clear as to whether district courts fall within the definitions of either "state governmental entity" or "local governmental entity." *See* Tex. Gov't Code § 554.001(2), (5); *supra* note 45.  The "local governmental entity" definition encompasses a "political subdivision of the state," a term that typically is not used to

18

The requirement of a "good faith" belief that the governmental entity possesses the required attributes incorporates both a subjective and objective component; i.e., an actual belief that must also be objectively reasonable in light of the claimant's training and experience.[52] The claimant must "in good faith" (so defined) believe that the relevant "entity" is "statutorily empowered to regulate under or enforce the actual law allegedly violated . . . or to investigate or prosecute a criminal violation."[53] Consequently, "the particular law the public employee reported violated is critical to the determination."[54] A "law" for purposes of the Whistleblower Act is defined as "a state

---

refer to state district courts. *See, e.g.*, Tex. Civ. Prac. & Rem. Code § 101.001(3) (Tort Claims Act definition of "governmental unit") (distinguishing between state courts and "a political subdivision of this state"). As for the Act's "state governmental entity" definition, while it explicitly refers to certain entities within the Judicial Branch, including appellate courts—"the Texas Supreme Court, the Texas Court of Criminal Appeals, a court of appeals, a state judicial agency, or the State Bar of Texas"—district courts and other trial-level courts are not mentioned. Accordingly, a district court would fall within "state governmental entity" only if a court can be considered "a state judicial agency," but this construction would create a redundancy with the definition's explicit inclusion of appellate courts. *See* Tex. Gov't Code § 311.021(2) (presumption that "the entire statute is intended to be effective"); *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003) (declining to read statute in way that would render some parts superfluous); *but cf. In re Estate of Nash*, 220 S.W.3d 914, 917-18 (Tex. 2007) ("While we recognize that we should avoid, when possible, treating statutory language as surplusage, there are times when redundancies are precisely what the Legislature intended . . . 'out of an abundance of caution, for emphasis, or both.'" (quoting *In re City of Georgetown*, 53 S.W.3d 328, 336 (Tex. 2001) (orig. proceeding))). But we need not resolve these questions here.

[52] *Gentilello*, 398 S.W.3d at 683 (discussing *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 320 (Tex. 2002)); *see also id*. (restating the objective component in terms of whether "'a reasonably prudent employee in similar circumstances' would have thought so." (quoting *Needham*, 82 S.W.3d at 320)).

[53] *Id.* at 685-86.

[54] *Needham*, 82 S.W.3d at 320.

19

or federal statute," "an ordinance of a local governmental entity," or "a rule adopted under a statute or ordinance."[55]

In this case, Gaston asserts that the conduct she divulged to Judge Tittle represented "good faith" "reports" that McKenzie and various HCCSCD subordinates[56] had violated both article 42.12 of the Code of Criminal Procedure, previously discussed, and section 39.02 of the Penal Code—"abuse of official capacity"—which makes it a crime for "[a] public servant . . . , with intent to obtain a benefit . . . [to] intentionally or knowingly . . . misuse[] government property . . . or any other thing of value belonging to the government that has come into the public servant's custody or possession by virtue of the public servant's office or employment."[57]  Accordingly, the relevant inquiry regarding the appropriate-law-enforcement-authority element here is whether Gaston presented facts that would demonstrate that Gaston in "good faith" believed the 196th District Court is empowered to "regulate under or enforce" either Code of Criminal Procedure article 42.12 or Penal Code section 39.02, or to "investigate or prosecute" criminal offenses—in the sense these terms are used in the Whistleblower Act.[58]

Gaston's live pleadings do not allege specific facts that could meet this burden, only a bare conclusion parroting the statutory language—"Judge Tittle . . . is authorized to regulate under

---

[55] Tex. Gov't Code § 554.001(1).

[56] As previously indicated, the first element of Gaston's Whistleblower claim requires that the "reported" "violation of law" allegedly be committed by either the "employing governmental entity" or "another public employee." *See id*. § 554.002(a).  Each of Gaston's HCCSCD colleagues would suffice as a "public employee" for the same reasons she does.

[57] *See* Tex. Penal Code § 39.02.

[58] *See Gentilello*, 398 S.W.3d at 687.

or enforce the law alleged to be violated or is authorized to investigate or prosecute a violation of criminal law."[59] Accordingly, Gaston must rely on evidence of the required underlying facts if she is to invoke the district court's subject-matter jurisdiction.[60] She refers us to her deposition testimony. In it, Gaston claimed that she divulged her colleagues' conduct to Judge Tittle in the belief that he could "put a stop to it" by virtue of his power (1) as one of the four Hunt County local judges who oversee HCCSCD and serve as "the director's [McKenzie's] boss"; or (2) as a presiding judge in criminal cases, who could establish and enforce terms and conditions of probation against defendants and refuse to "accept the [CSR] hours" that probationers had purportedly worked but had instead "bought." Gaston added, without elaboration, that she perceived Judge Tittle could "investigate [the conduct] and see if it was legal or not."[61]

Even if Gaston's testimony could suffice to meet her burden as to the subjective component of her required good faith belief that Tittle was an "appropriate law enforcement authority," we must further consider whether these perceptions are objectively reasonable given her training and experience as a probation officer and court officer.[62]

---

[59] See City of Elsa, 325 S.W.3d at 625.

[60] See id. (deeming claimant's pleading allegations "conclusory" but additionally considering whether there was evidence that would establish the existence of the required jurisdictional facts).

[61] As an aside, the parties agree, and our own independent research seems to confirm—somewhat surprisingly to us—that there have been virtually no precedents addressing whether or under what circumstances a judge or court can be considered an "appropriate law enforcement authority" under the Whistleblower Act's definition of that term. Whether this dearth of case law implies anything about the merits of either party's arguments, of course, is entirely speculative.

[62] See Gentilello, 398 S.W.3d at 683.

*Oversight powers*

As presiding judge of the 196th District Court, as noted, Tittle shared oversight powers over HCCSCD. Gaston has not argued that her awareness of these oversight powers suffices as an objective good faith belief on her part that he is an "appropriate law enforcement authority" with respect to her "reports" of alleged "violations of law" within HCCSCD—and with good reason. As the Texas Supreme Court has repeatedly emphasized in recent years, a claimant's belief that a reported-to authority is empowered to ensure internal legal compliance within a governmental entity cannot, in itself, amount to an objectively reasonable belief that the authority is empowered to "regulate under" or "enforce" the relevant law, or to "investigate or prosecute a violation of criminal law," in the sense intended by the Whistleblower Act.[63] As the high court explained in *University of Texas Southwestern Medical Center v. Gentilello*:

> The upshot of our prior decisions is that for an entity to constitute an appropriate law-enforcement authority under the Act, it must have authority to enforce, investigate, or prosecute violations of law against third parties outside of the entity itself, or it must have authority to promulgate regulations governing the conduct of such third parties. Authority of the entity to enforce legal requirements or regulate conduct within the entity itself is insufficient to confer law-enforcement authority status. Indeed, holding otherwise would transform every governmental entity that is subject to any regulation or that conducts internal investigations or imposes internal discipline into law-enforcement authorities under the Act. Such a result would collide head-on with the Act's limited definition and our cases interpreting that definition.[64]

---

[63] *See, e.g., id.* at 683-88 (citing *City of Elsa*, 325 S.W.3d at 627-28; *Lueck*, 290 S.W.3d at 886; *Needham*, 82 S.W.3d at 319-21); *accord Ysleta Indep. Sch. Dist. v. Franco*, 417 S.W.3d 443, 444-46 (Tex. 2013) (per curiam); *Farran*, 409 S.W.3d at 655; *University of Houston v. Barth*, 403 S.W.3d 851, 857-58 (Tex. 2013) (per curiam); *Texas A & M Univ.—Kingsville v. Moreno*, 399 S.W.3d 128, 129-30 (Tex. 2013) (per curiam).

[64] *Gentilello*, 398 S.W.3d at 686.

22

Although *Gentilello* involved a report made to a supervisor within the same governmental entity as the claimant and alleged law violator (a state medical school), the supreme court has applied the same rationale to reports made to the governing bodies overseeing governmental entities, such as school boards.[65] At least in his capacity as one of the four "bosses" of McKenzie's and overseers of HCCSCD, Tittle's position is no different. Whatever power he possessed to control the practices of McKenzie and HCCSCD would amount merely to "enforc[ing] legal requirements or regulat[ing] conduct within [HCCSCD] itself" and would thus be "insufficient to confer law-enforcement authority status" with respect to Gaston's reports of alleged wrongdoing by McKenzie and his subordinates.[66]

On the other hand, as the supreme court also recognized in *Gentilello*, there is no categorical rule "that a Whistleblower Act report can *never* be made internally."[67] The report recipient, the court explained, could be "part of" an entity possessing authority extending beyond merely ensuring internal compliance and independently satisfying the definition of "appropriate law enforcement authority," such as with a police department supervisor who receives an internal report of a subordinate's criminal activity.[68] The ultimate thrust of Gaston's arguments concerning the "appropriate law enforcement authority" element is that the 196th District Court is vested with powers extending beyond merely ensuring internal legal compliance within HCCSCD,

---

[65] *See Franco*, 417 S.W.3d at 444-46; *Farran*, 409 S.W.3d at 655.

[66] *Gentilello*, 398 S.W.3d at 686.

[67] *Id*. (emphasis in original).

[68] *See id*.

23

bringing it within this qualification to the Texas Supreme Court's recent jurisprudence regarding "internal" reports.

### Adjudicative powers

Echoing the second rationale she articulated during her deposition, Gaston urges that Tittle is an "appropriate law enforcement authority" with regard to her "reports" of alleged violations of article 42.12 of the Code of Criminal Procedure (and, in turn, that her perception of his authority was objectively reasonable) because he is empowered as the presiding judge of the 196th District Court to administer and apply that law to defendants within that court's jurisdiction. In fact, Gaston emphasizes, the express purpose of article 42.12 is to "place wholly within the state courts the responsibility for determining when the imposition of sentence in certain cases shall be suspended, the conditions of community supervision, and the supervision of defendants placed on community supervision, in consonance with the powers assigned to the judicial branch of this government by the Constitution of Texas."[69] Likewise, as Gaston points out, article 42.12 provides that "[o]nly the court in which the defendant was tried may grant community supervision, impose conditions, revoke the community supervision, . . . discharge the defendant, . . . [or] alter conditions of community supervision."[70] In these ways, Gaston reasons, the 196th District Court is not only among the Texas governmental entities that are "authorized to . . . regulate under or enforce" article 42.12, but they are the *only* entities who can.

---

[69] *See* Tex. Code Crim. Proc. art. 42.12, § 1.

[70] *See id*. art. 42.12, § 10(a).

For at least two reasons, we conclude that Gaston's awareness that Judge Tittle was empowered to administer probation terms and conditions against defendants in the 196th District Court is not evidence of an objectively reasonable belief that he was an "appropriate law enforcement authority" with respect to Gaston's "reports" of alleged "violations" of article 42.12 by HCCSCD personnel.

*Scope of "regulate under" and "enforce"*

The most obvious reason is that the Legislature could not have intended the Act's definition of "appropriate law enforcement authority," and the component phrase "authorized to . . . *regulate under* or *enforce* the law alleged to be violated in the report," to encompass a court's authority to apply the reported-about "law" in the cases and proceedings before it. Even before the Legislature added the definition to the Act in 1995, this Court aptly observed in *Robertson County v. Wymola* that the ordinary meaning of "appropriate law enforcement authority" denotes "an investigative or executive function" that "[t]he judicial branch does not perform."[71] And that definition, as the Texas Supreme Court has repeatedly indicated, is only more emphatic in "restrict[ing] 'law enforcement authority' to its commonly understood meaning."[72] Although the high court has yet to address specifically whether judges or courts can fall within that definition,

---

[71] *Wymola*, 17 S.W.3d at 341 (distinguishing *City of Dallas v. Moreau*, 697 S.W.2d 472, 475 (Tex. App.—Dallas 1985, no writ), a Whistleblower case involving a bailiff, from a situation where the claimant had allegedly reported wrongdoing to the local sheriff's department, an entity that "is a part of the executive branch and is charged with investigating and enforcing the laws of the State.").

[72] *Gentilello*, 398 S.W.3d at 689.

25

its recent cases have identified attributes of an "appropriate law enforcement authority" that are characteristic only of entities within the other governmental branches:

- "free-standing regulatory, enforcement, or crime-fighting authority."[73]

- "those who either make the law or pursue those who break the law," consistent with "the Act's undeniable focus on law enforcement."[74]

- "for an entity to constitute an appropriate law-enforcement authority under the Act, it must have authority to enforce, investigate, or prosecute violations of law against third parties outside of the entity itself, or it must have authority to promulgate regulations governing the conduct of such third parties."[75]

- "power to enforce the law allegedly violated or to investigate or prosecute criminal violations against third parties generally."[76]

- "authorities that issue legal directives, not authorities that follow them."[77]

- "a law-enforcement official formally investigating or prosecuting [legal] noncompliance on behalf of the public, or a regulatory authority charged with promulgating or enforcing regulations applicable to third parties generally."[78]

The core notion identified by the Texas Supreme Court is an entity that is empowered to respond on behalf of the public to reported alleged "violations of law" by taking action against whatever third parties may have committed the alleged wrongdoing. A court's power to apply

---

[73] *Id*. at 682.

[74] *Id*.

[75] *Id*. at 686.

[76] *Id*.

[77] *Id*.

[78] *Id*. at 687.

26

the "law" or remedy an alleged violation of it through adjudication is, of course, dramatically more limited than this, operative solely within a narrow range of disputes and parties over which the Texas Constitution and laws have conferred it jurisdiction,[79] and further limited by justiciability requirements serving to ensure that any parties possess interests *distinguishing* them from the general public.[80] Those limitations on judicial power, and the resultant disconnect between the sorts of "regulation" or "enforcement" the Act contemplates and the limited law-application and adjudication performed by judges, are fully evident here. Under Gaston's theory, the sole "third parties" against whom Judge Tittle could be said to "regulate under" or "enforce" article 42.12 would be probationers—*if* they happened to be within his court's jurisdiction—and not the HCCSCD personnel whom Gaston claims actually committed the relevant "violations" of that statute. While Tittle might be able to address alleged violations by HCCSCD personnel through his role on the department's oversight body, in neither that capacity nor his judicial one would he be "regulating under" or "enforcing" article 42.12 as the supreme court has viewed those terms.[81]

Our sister court in Amarillo has reached a similar conclusion in the course of deciding—in the well-publicized litigation between Texas Tech University and former head football coach Mike Leach—that a lawsuit Leach filed against the University in district court was not

---

[79] *See* Tex. Const. art. V, §§ 1, 3, 5, 6, 8, 16, 19; Tex. Gov't Code §§ 22.001 (describing appellate court jurisdiction), 24.007 (district courts), 25.0003 (statutory county courts); 25.0021 (statutory probate courts); 26.041-.052 (constitutional county courts), 29.003 (municipal courts), 30.00005 (municipal courts of record).

[80] *See, e.g.*, *Finance Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 579-85 (Tex. 2013) (discussing standing and other justiciability doctrines); *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 443-48 (Tex. 1993) (discussing standing); *Bacon*, 411 S.W.3d at 174-75 (same).

[81] *See Gentilello*, 398 S.W.3d at 686.

27

a "report" of a "violation of law" under the Whistleblower Act.[82]  The court reasoned in part that "report" must be construed within the context of the term's usage within the Act, and that context included the requirement that the "report" be made to an "appropriate law enforcement authority."[83] "Such an entity," the court observed, "is one charged with the ability to enforce or regulate the laws purportedly breached or investigate the breach of those laws."[84]  And "[t]he description," the court continued:

> calls forth visions of police, administrative agencies, district attorneys, the attorney general, and like bodies commonly associated with investigating and enforcing the law.  It takes a much greater stretch of the imagination to include a district court within the category.  Indeed, precedent recognizes that the role of the judiciary excludes investigative or executive functions of the type contemplated by the statute. And, the void is not filled simply because a district court has some "general" authority to intercede in legal matters, especially when that authority is adjudicative as opposed to investigatory or regulatory.[85]

We agree, and would add that this "stretch of the imagination" would hardly be the "clear and unambiguous" statutory language that is required before we can construe "regulate under" and "enforce" to apply to judicial adjudication and effectuate the waiver of immunity on which Gaston relies.[86]

---

[82]  *See Leach v. Texas Tech Univ.*, 335 S.W.3d 386, 395-98 (Tex. App.—Amarillo 2011, pet. denied).

[83]  *Id*. at 396.

[84]  *Id*. (citing *Needham*, 82 S.W.3d at 319-20).

[85]  *Id*. (citing *Needham*, 82 S.W.3d at 319-20; *Wymola*, 17 S.W.3d at 341).

[86]  *See Lueck*, 290 S.W.3d at 880 (quoting Tex. Gov't Code § 311.034).

28

Gaston has cited no authorities persuading us to think otherwise. She does refer us to a 2004 decision of the Corpus Christi Court of Appeals involving a Whistleblower suit brought against the Texas Department of Criminal Justice by a former employee who had been fired after complaining of alleged agency malfeasance to the Travis County District Attorney, the State Auditor, and federal judge William Wayne Justice, who at the time was maintaining oversight authority over the Texas prison system through the *Ruiz* judgment.[87] "[L]iberally construing the definition of 'law' to effect the remedial purposes of the Whistleblower Act," the Corpus Christi Court held that "law" as defined in the Act encompassed the *Ruiz* judgment, that Judge Justice was an "appropriate law enforcement authority" for these purposes, and that the former employee's allegations of these facts sufficed to invoke the Whistleblower Act's waiver of immunity.[88] Leaving aside whether this decision can be reconciled with the statutory text[89] or the Texas Supreme Court's intervening jurisprudence regarding jurisdictional issues under the Act,[90] the nature of the authority exerted by Judge Justice in *Ruiz* would distinguish the case from the present one, which involves the more mundane powers vested in Texas state courts to apply article 42.12 in criminal proceedings pending before them.

---

[87] *Scott*, 147 S.W.3d at 613-14, 622-23.

[88] *See id.* at 620-23.

[89] *Cf*. Tex. Gov't Code § 554.001(1) ("'Law' means: (A) a state or federal statute; (B) an ordinance of a local governmental entity; or (C) a rule adopted under a statute or ordinance.").

[90] *Cf., e.g.*, *Lueck*, 290 S.W.3d at 880 (Whistleblower Act, like other statutes, "'shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language.'" (quoting Tex. Gov't Code § 311.034)).

But this decision does serve to highlight a factual distinction between the present case and *Leach* that only further confirms the Legislature could not have intended "regulate under" or "enforce" to encompass judicial application of law in pending proceedings. In *Leach*, the Amarillo court was addressing a purported "report" of "violations of law" made to a district court in the form of a pleading filed before it, which is the customary and permissible way through which concerned parties may bring complaints of legal violations before a court for remedy or redress through adversarial proceedings in which all sides have notice and opportunity to be heard. As with the Corpus Christi case, Gaston did not "report" her "violations of law" to Judge Tittle that way—as previously indicated, she conveyed her allegations outside of judicial proceedings, but with the intent or expectation that Tittle would take action within judicial proceedings. Gaston's notion that a judge or court could be an "appropriate law enforcement authority" with respect to such out-of-court "reports" would run headlong into the well-established limitations and prohibitions relating to ex parte communications,[91] of which we can presume the Legislature was aware when enacting the definition.[92] Gaston's view would imply either that the Whistleblower Act contemplates judges will act on ex parte "reports" by "regulating under" or "enforcing" the relevant law in pending

---

[91] *See* Tex. Code Jud. Conduct, Canon 3(B)(8), *reprinted in* Tex. Gov't Code, tit. 2, subtit. G, app. B ("A judge shall not initiate, permit, or consider *ex parte* communications or other communications made to the judge outside the presence of the parties between the judge and a party, an attorney, . . . or any other court appointee concerning the merits of a pending or impending judicial proceeding."); *see also United States Gov't v. Marks*, 949 S.W.2d 320, 325-27 (Tex. 1997) (observing that Texas law "looks upon *ex parte* proceedings with extreme disfavor" and recognizing that trial court's reliance on ex parte statements could violate individual's due process rights).

[92] *See In re Allen*, 366 S.W.3d at 706 ("'A statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it.'" (quoting *Acker*, 790 S.W.2d at 301)).

cases, effectively abrogating the limits and potentially creating Due Process problems,[93] or that the reported-to judges will be bound to recuse themselves,[94] rendering the "appropriate law enforcement authority" unable to act. Either implication demonstrates compellingly that we are not to construe the Act that way.[95]

In sum, for all of these reasons the Legislature could not have intended "authorized to . . . *regulate under* or *enforce* the law alleged to be violated in the report" to encompass a court's authority to apply the reported-about "law" in adjudicating the cases and proceedings before it. While Gaston may have been reasonable in perceiving that Judge Tittle, as presiding judge of the 196th District Court, was empowered to apply article 42.12 to the defendants and probationers within his court's jurisdiction, that power is not the power to "regulate under" or "enforce" article 42.12 as the Whistleblower Act uses those terms. Consequently, Gaston has failed to plead or present evidence of an objective good faith belief on her part that Judge Tittle was an "appropriate law enforcement authority" with respect to her "reports" of article 42.12 "violations."

---

[93] *See Marks*, 949 S.W.2d at 325-27.

[94] *See Gaal v. State*, 332 S.W.3d 448, 452-56 (Tex. Crim. App. 2011) (discussing bases for recusal of judges including where evidence of ex parte communications establishes personal bias (citing *Abdygapparova v. State*, 243 S.W.3d 191, 207-10 (Tex. App.—San Antonio 2007, pet. ref'd) (ex parte communications between trial court judge and prosecutor demonstrated that "trial judge lacked the impartiality that due process requires"))).

[95] *See Jose Carreras, M.D., P.A. v. Marroquin*, 339 S.W.3d 68, 73 (Tex. 2011) (declining to interpret statute in manner that would lead to absurd results); *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 706-08 (Tex. 2002) ("We must . . . , if possible, construe statutes to avoid constitutional infirmities.") (citations omitted).

*The specific alleged "violations" of article 42.12*

Alternatively, even if it could be said that the power Tittle possessed to apply article 42.12 in his court's cases and proceedings could suffice as the power to "regulate under" or "enforce" article 42.12 in the sense the Act contemplates, Gaston has still failed to demonstrate an objective good faith belief that he was an "appropriate law enforcement authority" with respect to the particular alleged article 42.12 "violations" she "reported" to him. Gaston's "reports" of "violations of law" by HCCSCD personnel, as previously explained, concerned the arranging or facilitating of the award of CSR-hour credits in exchange for donations of money and equipment for an exercise facility. As Gaston acknowledges, and the evidence conclusively demonstrates, McKenzie put an end to the solicitation of these donations in mid-February 2011, and each of the "violations" of article 42.12 she "reported" would have stemmed from donations collected from probationers prior to that time. As Gaston further acknowledges, Tittle's authority to prevent or remedy any such "violations" in his capacity as the presiding judge of the 196th District Court—or, in terms of the statutory definition, to "regulate under" or "enforce" article 42.12—would have extended only to the cases and defendants within his court's jurisdiction. But Gaston neither pled nor presented evidence that any of the probationers who had donated money or equipment for the exercise facility had actually been under the jurisdiction of the 196th District Court, as opposed to that of the three other Hunt County criminal trial courts. In fact, the sole evidence on that point, an e-mail from McKenzie, recounts that a total of fifteen probationers donated either money or exercise equipment and that none were on probation out of the 196th District Court.[96] Nor did Gaston plead

---

[96] McKenzie further indicated that "all but 4 came out of one of the County Courts[,] [t]hree were from other counties[,] and one came out of the 354th."

or present any evidence tending to demonstrate any reasonable basis for her to perceive that any of these probationers had, in fact, been under the jurisdiction of the 196th District Court, as opposed to one of the other local trial courts.

Even if it could be said that Tittle, as presiding judge of the 196th District Court, had power to "regulate under" or "enforce" article 42.12 in *some* cases or contexts, mere "general authority" is insufficient to qualify an authority as an "appropriate law enforcement authority."[97] Rather, his authority must be tied to the specific alleged statutory violation at issue.[98] And absent pleadings or proof that the specific alleged article 42.12 "violations" Gaston "reported" to Judge Tittle concerned probationers over whom he exercised jurisdiction, or that Gaston has any reasonable basis to believe that they did, Gaston has failed to meet her burden of demonstrating an objective good faith belief on her part that Tittle is an "appropriate law enforcement authority" with respect to those violations.

### Power to "investigate"

Gaston's final argument is that her deposition testimony alluding to a power or ability on the part of Judge Tittle to "investigate [her colleagues' activities] and see if it was legal or not" should be construed as a reference to the court-of-inquiry process under chapter 52 of the Code of Criminal Procedure.[99] Under chapter 52, "a judge of any district court of this state, acting in his capacity as magistrate," may request that the regional administrative judge appoint another

---

[97] *See Needham*, 82 S.W.3d at 319-20.

[98] *See id*.

[99] *See generally* Tex. Code Crim. Proc. arts. 52.01-.09.

district court "to commence a Court of Inquiry" on sworn findings of the first judge of "substantial facts establishing probable cause that a specific offense has been committed against the laws of this state."[100] The appointed (i.e., second) district judge then "shall issue a written order commencing the Court of Inquiry and stating its scope," in which the judge "may summon and examine any witness in relation to the offense."[101] "If it appear from a Court of Inquiry or any testimony adduced therein[] that an offense has been committed, the Judge shall issue a warrant for the arrest of the offender as if complaint had been made and filed."[102]

Emphasizing these features of the court-of-inquiry process, Gaston argues that district courts are, in these ways, empowered to "investigate . . . a violation of criminal law," as contemplated by the Act's "appropriate law enforcement authority" definition. Similarly, while "hav[ing] no quarrel with the majority's conclusion that trial courts do not meet the statutory definition of an 'appropriate law enforcement authority' when only their *adjudicative* or *supervisory* capacities are implicated,"[103] the dissent insists that "Chapter 52 . . . unambiguously permit[s]" district court judges "to step out of their adjudicatory roles and . . . investigate—and to a limited degree prosecute—alleged violations of criminal law."[104] We disagree that Gaston's reference to Judge Tittle "investigat[ing]" her allegations changes the analysis.

---

[100] *Id*. art. 52.01.

[101] *See id*. arts. 52.01-.07.

[102] *Id*. art. 52.08.

[103] Slip op. at 5 (emphases in original).

[104] *Id*. at 6.

34

As an initial observation, Gaston presented no allegation or evidence that she "reported" the asserted "violations of law" with the intent or belief that Judge Tittle would "investigate" them through the court-of-inquiry process. Instead, Gaston indicated, without further elaboration, that she desired Judge Tittle to "investigate [her colleagues' conduct] and see whether it was legal or not." Without more, Gaston could not have met her burden to show a subjective good faith belief that Judge Tittle was empowered to "investigate . . . a violation of law" in any sense material to the "appropriate law enforcement authority" definition.[105] Contrary to the dissent's insinuations, this is not a matter of Gaston failing to identify "the precise method" by which a law-enforcement entity can investigate or prosecute a violation of criminal laws,[106] but a failure to present pleadings or proof explaining what she meant by her use of the verb "investigate" in the first place. If, for example, Gaston was referring simply to Tittle's power to "investigate" the alleged criminal law violations in the context of adjudicating community supervision matters in his court, the assertion would add nothing to the analysis.

But even assuming that we should "liberally construe" Gaston's use of "investigate" to be an oblique reference to some power lying beyond a district court's "adjudicatory roles," or to a district court's authority under chapter 52 in particular, that power is still not the sort of "free-standing regulatory, enforcement, or crime-fighting authority"[107] or "power to enforce the law allegedly violated or to investigate or prosecute criminal violations against third

---

[105]  *Cf. City of Elsa*, 325 S.W.3d at 626-27 (no allegations or evidence of claimant's subjective belief he was "reporting" a "violation of law" by defendant).

[106]  Slip op. at 9.

[107]  *Gentilello*, 398 S.W.3d at 682.

parties generally"[108] that has been held to characterize an "appropriate law enforcement authority." Instead, the Legislature has placed significant constraints on the powers of district courts within the court-of-inquiry process. These limitations include, importantly, dividing (1) the power to request the initiation of a court of inquiry from (2) the power to conduct the court of inquiry itself, which must be performed by a different district judge than the one who requested it.[109]

The court-of-inquiry proceeding entails the judge hearing evidence and making findings in much the same fashion as in a trial.[110] If this proceeding amounts to an "investigation" or "prosecution" of the sort that would render the presiding judge an "appropriate law enforcement authority," then it would seem that any criminal trial would also. But more to the point here, the power of the first district court in the court-of-inquiry framework—the position of Judge Tittle and the 196th District Court here—is not materially distinct from that of any other governmental official "who must refer suspected illegality to external entities."[111] The existence of such power, as we have seen, is insufficient to support an objective good faith belief that Tittle was an "appropriate law enforcement authority" with respect to Gaston's "reports" of alleged penal code violations.[112]

The upshot of the dissent's contrary contentions is that these limited powers under chapter 52 transform all of Texas's hundreds of district judges and courts—whose adjudicatory or oversight powers would not otherwise bring them within the definition, as the dissent

---

[108] *Id*.

[109] *See* Tex. Code Crim. Proc. art. 52.01(b)(2) ("The presiding judge shall not name the judge who requests the Court of Inquiry to preside over the Court of Inquiry.").

[110] *See id*. arts. 52.01-.07.

[111] *See Gentilello*, 398 S.W.3d at 689.

[112] *See id.*

acknowledges—into "appropriate law enforcement authorities" under the Whistleblower Act with respect to any alleged violation of a criminal statute. And this is so, the dissent further reasons, even if the purported whistleblower gives nary a hint that he or she is attempting to trigger the court-of-inquiry process, as opposed to raising the complaint in the context of adjudication. If the dissent is correct, *Leach* was wrongly decided, the jurisdictional and constitutional limitations that would otherwise distinguish district courts from "appropriate law enforcement authorities" are ultimately irrelevant, and the Legislature intended "investigate or prosecute a violation of criminal law" in the 1995 definition (an amendment that Texas courts have heretofore perceived as a significant tightening of the Act[113]) to instead dramatically expand Whistleblower exposure based on "reports" made to judges far beyond the traditional parameters we noted in *Wymola*. The Legislature did not do this, of course, and no court has ever reached such a conclusion. In the very least, the Legislature certainly did not do so with the "clear and unambiguous language" required to effect a waiver of sovereign or governmental immunity.[114]

## CONCLUSION

Whether Texas law can or should "do something" about the alleged "violations of law" Gaston "reported" to Judge Tittle is, of course, not the issue we decide today. (We note, however, that there was evidence Judge Tittle himself responded to Gaston's "reports" by referring

---

[113] *E.g.*, *Needham*, 82 S.W.3d at 319-21.

[114] *See Lueck*, 290 S.W.3d at 880 (quoting Tex. Gov't Code § 311.034). We would add that if the Legislature had actually contemplated that "investigate or prosecute a violation of criminal law" could be construed to encompass district courts by virtue of chapter 52, this might well explain a decision to exclude such courts from the Act altogether. *See supra* note 51. But, as previously explained, we need not reach that question today.

the matters to the local district attorney and the county auditor). We hold only that the Legislature has not chosen to include Gaston's reports in the universe of "reports" to "appropriate law enforcement authorities" that are contemplated by the Whistleblower Act, or at least not with the clarity required to effectuate a waiver of immunity. As the Texas Supreme Court observed in *Gentilello*, "[i]t may well be reasonable for a government employee to report suspected violations of law to a supervisor"—or for that matter, to a district judge who is a friend and has some supervisory powers over the alleged offenders—"but that does not mean every supervisor meets the Whistleblower Act's definition of an 'appropriate law enforcement authority.'"[115] "This is a legislatively-mandated legal classification, one tightly drawn, and we cannot judicially loosen it" to include Judge Tittle here.[116]

As these jurisdictional defects are incurable, we reverse the district court's order denying HCCSCD's plea to the jurisdiction, grant the plea, and dismiss Gaston's suit for want of subject-matter jurisdiction.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose;
   Dissenting Opinion by Chief Justice Jones

Reversed and Dismissed on Motion for Rehearing

Filed:  September 19, 2014

---

[115] *Gentillelo*, 398 S.W.3d at 689.

[116] *Id*.