COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



ANITA CONNALLY,  §

                                  §          No. 08-15-00310-CV

            Appellant,  §

                                  §          Appeal from the

v.  §

                                  §          298th District Court

DALLAS INDEPENDENT SCHOOL  §
DISTRICT,

                                            of Dallas County, Texas

                                  §

            Appellee.  §          (TC # DC-14-12387)

                                  §

# **O P I N I O N**

Anita Connally sued the Dallas Independent School District (DISD) for wrongful termination in violation of the Texas Whistleblower Act. The trial court granted DISD's plea to the jurisdiction and dismissed Connally's entire lawsuit based on governmental immunity. We conclude Connally's report to the manager of DISD's Professional Standards Office was not to an appropriate law enforcement authority as required by the Act, even though the manager was a commissioned police officer and a former member of the DISD police department. We conclude, however, that Connally's reports of possible Tampering with a Governmental Record made directly to the DISD police department, which DISD concedes had outward-looking enforcement

authority, were sufficiently specific to constitute reports of violations of law as required by the Act.  Accordingly, we affirm in part, and reverse and remand in part.[1]

## BACKGROUND

DISD hired Connally in 2009 as its Director of Compliance.  As part of her duties, Connally was to assist in implementing recommendations from a 2009 report that had made numerous recommendations to DISD to ensure its compliance with University Interscholastic League (UIL) rules concerning athletics and other extracurricular activities.[2]  Connally's job required her to direct and oversee DISD's compliance with UIL rules, to identify existing or potential problems that might affect DISD's ability to remain in UIL compliance, and to provide training, ongoing support, and communication to district staff concerning compliance and eligibility requirements for all UIL extracurricular activities.  The position was often referred to as the "Compliance Department," even though Connally was the department's only employee.  Despite her title as Compliance Director, Connally believed she had little enforcement authority when it came to UIL rules and viewed herself as little more than a "rules educator" for DISD personnel.

### PAPF and Home Visitation Forms

Connally believed that one serious problem facing DISD was its compliance with the UIL rule requiring student-athletes to reside within the attendance zone of the high school for which

---

[1] This case was transferred from the Dallas Court of Appeals, and we apply the precedent of that Court to the extent required by TEX. R. APP. P. 41.3.

[2] The UIL is a voluntary nonprofit association of Texas public schools, created by the University of Texas at Austin to establish rules governing extracurricular athletic and academic contests in all Texas public schools and certain private parochial schools that have joined the UIL.  *Univ. Interscholastic League v. Sw. Officials Ass'n, Inc.,* 319 S.W.3d 952, 954-55 (Tex.App. – Austin 2010, no pet.); TEX. EDUC. CODE ANN. § 33.083(b) (West Supp. 2016).  School districts agreeing to participate in UIL events must agree to abide by the UIL rules.

they played a varsity sport.[3] In order to prevent illegal recruiting of student-athletes, the UIL requires the filing of a Prior Athletic Participation Form (PAPF) to ensure that a student-athlete transferring into a new high school actually lives within the new school's attendance zone. The student's parents are required to fill out the form and to provide residency information and proof of the student's new address. The form must be signed by the student, the student's parent, and the coach of the student's new high school, certifying that the information provided in the form is true and correct, and the form must then be filed with the district. The student must certify he or she was not recruited, and the superintendent of the new school must certify that the student-athlete was not given any inducement to transfer.

The filing of a PAPF form triggers a home visit, which is required by UIL rules to be made by the new district's athletic personnel to ensure that the student is actually living at the location provided in the PAPF form. The visiting employee, typically a DISD coach, is required to speak with the residents at the address to ensure that the student's residency information is accurate. During the 2012-2013 school year, Connally created a Home Visitation Form to be filled out whenever a home visit was performed, after a DISD coach at Woodrow Wilson High School was found to have "falsified" a home visit by representing that he had conducted a home visit when in fact he had not. The Home Visitation Form must be signed by the coach visiting the student's address, as well as the District's Athletic Coordinator and the campus principal, to certify that they have verified the student's residence. Although the form is not required by UIL rules, DISD requires it be filed with the district along with the PAPF form before a student-athlete is allowed to participate in varsity sports at his new high school.

---

[3] UIL eligibility rules require varsity student-athletes to reside within the residency zone of the high school for which they play, unless the student receives a hardship waiver from the UIL.

Connally was not responsible for reviewing completed PAPF or Home Visitation forms. Instead, the forms were reviewed by the Chairperson of DISD's UIL District Executive Committee (DEC). If the forms raised any concerns, they would be presented at a DEC meeting for the entire Committee to review. After the incident involving the Woodrow Wilson High School coach, Connally was asked to begin attending DEC meetings. Connally's role at the DEC meetings appears to have been that of an observer and as a resource on UIL requirements. Although she apparently was permitted to ask questions and to point out issues with residency forms and documentation, she had no right to vote on issues presented to the Committee, and she had no enforcement authority to ensure that the Committee made the correct decision in reviewing questionable forms.

## The Alleged Incidents of Wrongdoing

### *The September 4, 2013 DEC Meeting ("Coach W.")*

At a September 4, 2013 DEC meeting Connally attended, a Madison High School Coach identified as "Coach W.," who was also the parent of a student-athlete, presented a PAPF form to the Committee, together with a one-month lease agreement for August 2013 on a residence within the Madison High School residency zone, making it appear that he and his son had moved into the campus's attendance zone from their former residence in DeSoto, Texas. Coach W. also presented a Home Visitation Form to the DEC Committee, indicating that three DISD coaches had visited his new home to verify his son's new residence. Connally believed the documents submitted by Coach W. were "inadequate if not fraudulent," and she initiated her own investigation of the matter, which turned up county tax records revealing that Coach W. still owned a home in Desoto outside Madison High School's attendance zone.

4

### Wilmer-Hutchins High School (Student-Athlete "TC")

In March 2014, Connally learned from news reports that a student-athlete, identified as "TC," who had played basketball for Wilmer-Hutchins High School, had been killed in an apparent beating outside his residence. In the news reports, TC's family members were quoted as saying that TC had been living with his cousins within the campus's residency zone in order to play for the high school. This prompted Connally to suspect that TC may have been illegally recruited to play basketball for Wilmer-Hutchins, and she begin investigating TC's residency status, which included reviewing DISD records and speaking with TC's former teachers and coaches. Connally ultimately concluded that TC's PAPF form was "fraudulent and had been falsified by the coaches at that school." She further suspected that no one had ever conducted a home visit at TC's alleged residence to ensure that he had actually been residing within the campus's attendance zone.

### Madison High School (Student-Athlete "JT")

In May 2014, Connally learned that a student-athlete, identified as "JT," who was playing on the Madison High School basketball team, appeared to be living outside the campus residency zone. Connally conducted an investigation that revealed JT's residency forms had never been completed. Connally spoke with support staff at Madison High School, who informed her that the school's coaches would routinely "take care" of incomplete residency documents, and apparently did so in JT's case, allowing him to play basketball for the high school without establishing a residence within the school's attendance zone.

### The PSO Investigations

Beginning in October 2013, Connally reported her suspicions of wrongdoing at various times to three departments within DISD: (1) the Office of Professional Responsibility (OPR); (2) the Internal Audit Department (IA); and (3) the Professional Standards Office (PSO).[4] All of these departments were tasked solely with conducting internal, administrative investigations of employee wrongdoing. Connally's reports were all ultimately investigated by the PSO, led by Jeremy Liebbe in his position as PSO manager, with the assistance of investigators from all three departments. The investigations lasted from April to May 2014 and centered on eleven DISD employees, including coaches at both Madison and Wilmer-Hutchins High Schools. Connally served as an expert witness on UIL rules, provided statements, and assisted in fact-gathering in support of the investigations.

During two interviews with IA in February and March 2014, Connally also reported her general belief that the process for reviewing PAPF and Home Visitation Forms was faulty and wrought with possible bias. Connally believed that the DEC committee members who ultimately voted on eligibility questions for transferring student-athletes had conflicts of interest and that they might feel pressured to affirm a residency form presented by another DISD employee. She advocated that her department be given responsibility for reviewing the forms. Connally further suggested that her department be given the sole authority to make the final decision whether a student-athlete had complied with the UIL's residency requirements before the student would be allowed to participate in any varsity sports.

---

[4] Connally first discussed the matter involving Coach W. with OPR investigators in October 2013, shortly after the DEC meeting at which Coach W. presented his son's residency forms. Connally made her first formal reports to OPR and PSO regarding Coach W. in February 2014 and shortly thereafter reported her concerns to IA. She first made her reports involving TC to OPR and IA in March 2014, and made her initial report regarding JT to PSO in May 2014.

On May 27, 2014, after PSO's initial investigation of Connally's allegations concluded, but before PSO released its official report of its findings, Liebbe met with the DISD Superintendent Mike Miles to discuss his findings. At that meeting, Liebbe suggested that the matter be referred to the District Attorney's office for possible criminal prosecution. According to Liebbe, Miles declined to refer the matter, and instead "elected to pursue only administrative sanctions and not criminal charges[.]" During this same meeting, Miles requested that Liebbe conduct an investigation of Connally and other DISD athletic department personnel who were not the subject to his original investigation. Liebbe's department subsequently investigated Connally and concluded she had not engaged in any wrongdoing.

On June 5, 2014, the PSO issued a detailed report in which it confirmed virtually all of Connally's reports of wrongdoing. The PSO found that Coach W. had "engaged in fraud by forgery of a document belonging to the District," had "falsified a District record," and had "provided untruthful statements during an interview related to an official investigation." The PSO also found that DISD coaches at Wilmer-Hutchins High School had illegally recruited TC to play basketball for the school, and that the high school's basketball coach had asked other teachers to falsify TC's records and had personally "falsified" TC's PAPF form and Home Visitation Form. The PSO also found similar wrongdoing with regard to JT, indicating that he had been allowed to play varsity sports at Madison High School even though he had no Home Visitation Form on file and had not provided the school with adequate proof of his residence.

### The Terminations

The day after the PSO report was released to the public, DISD Superintendent Mike Miles announced that DISD was terminating Connally, along with its athletic director and two assistant

athletic directors, and that the district was recommending the termination of eight high school coaches and assistant coaches. The termination letter provided to Connally pointed out that Connally was an at-will employee who could be fired at any time for any non-prohibited reason. The letter notified Connally that she was being terminated for performance issues. Connally was afforded a series of grievance hearings at which DISD counsel argued that Connally had been hired to ensure that DISD was in UIL compliance, and that she was terminated due to her failure to ensure that compliance. DISD argued that in effect Connally was terminated because she did not act soon enough to prevent or discover the wrongdoing that had been uncovered during the PSO investigation, and that her reports to PSO and the other DISD departments came after the "horses had long left the barn[.]"

**The Trial Court Proceedings**

Connally sued DISD, claiming that DISD wrongfully terminated her in retaliation for making her reports in violation of the Texas Whistleblower Act. In her original petition, Connally referred only to the reports she had made to the OPR and the PSO, and claimed that DISD terminated her in order to "save face" when the PSO's report substantiating her allegations became public.

DISD filed a plea to the jurisdiction, claiming it had governmental immunity from suit and that Connally's claims did not come within the limited waiver of immunity set forth in the Whistleblower Act. Among other things, DISD argued that the OPR and PSO were authorized to conduct only internal investigations and were therefore not appropriate law enforcement authorities under the Act. DISD also contended that Connally had not pleaded that she had reported any criminal law violations committed by DISD employees as required by the Act.

8

In response, Connally amended her petition and alleged that she had also made reports of wrongdoing to other entities or individuals that she believed in good faith were appropriate law enforcement agencies as defined by the Whistleblower Act, including: (1) the Chief and Assistant Chief of the DISD police department; and (2) the PSO's manager, Jeremy Liebbe, who was a commissioned police officer and a former detective with the DISD police department. In her response to DISD's plea to the jurisdiction, Connally argued that she had reported "suspected violations of criminal law" to both Liebbe and the DISD police department, including suspected violations of the Texas Penal Code Sections 37.10 (Tampering with Governmental Record) and 32.21 (Forgery), based on her reports that DISD employees had falsified, altered, or forged PAPF and Home Visitation Forms.[5] In support of her response to the plea to the jurisdiction, Connally attached, among other things, an affidavit from Jeremy Liebbe describing the PSO's authority and a summary of his investigations; an affidavit from Vickie Blair, a former OPR Department employee, explaining OPR's authority; and her own affidavit in which she described the nature of the various reports she made in support of her whistleblower claim. DISD then supplemented its plea to the jurisdiction, adding among other things, the affidavits of the Chief and Assistant Chief of the DISD police department detailing their interactions with Connally.

At the hearing on DISD's plea to the jurisdiction, the parties' arguments centered almost exclusively on two questions: (1) whether Connally made her reports to an appropriate law enforcement authority; and (2) whether she reported any criminal law violations over which those

---

[5] Connally also indicated in a footnote in her response that she reported violations of Section 15.02 (Criminal Conspiracy), but provided no explanation of what facts she reported that would have supported a violation. *See* TEX. PENAL CODE ANN. § 15.02 (West 2011). Similarly, in her appellate brief, Connally states in a footnote that she reported a possible violation of criminal conspiracy, but again provides no explanation why she believed a criminal conspiracy may have existed. This issue was not adequately addressed in the trial court nor adequately briefed on appeal, and we therefore decline to address it.

9

particular authorities had jurisdiction. After hearing, the trial court issued a written order granting DISD's plea to the jurisdiction and dismissing Connally's lawsuit in its entirety.

## DISCUSSION

On appeal, Connally contends the trial court erred in granting DISD's plea to the jurisdiction, arguing that she presented sufficient jurisdictional evidence to raise a fact question that she made adequate reports of criminal law violations to appropriate law enforcement authorities in order to invoke the Whistleblower Act's limited waiver of governmental immunity.

### Standard of Review and Applicable Law

Governmental entities, including school districts such as DISD, are immune from suit unless the legislature expressly waives that immunity. *Mullins v. Dallas Indep. Sch. Dist.,* 357 S.W.3d 182, 185-86 (Tex.App. – Dallas 2012, pet. denied) (citing *State v. Lueck,* 290 S.W.3d 876, 880 (Tex. 2009)). The Legislature has provided a limited waiver of governmental immunity in the Texas Whistleblower Act. *See Lueck*, 290 S.W.3d at 882. In particular, the Act provides that: "A public employee who alleges a violation of this chapter may sue the employing state or local governmental entity for the relief provided by this chapter. Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter." TEX. GOV'T CODE ANN. § 554.0035 (West 2012).

Whether a court has subject matter jurisdiction under the Whistleblower Act is a question of law that a court reviews *de novo*. *City of Elsa v. Gonzalez,* 325 S.W.3d 622, 625 (Tex. 2010) (citing *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex. 2004)). In a plea to the jurisdiction, a defendant may challenge either the adequacy of the plaintiff's pleadings or the existence of jurisdictional facts on the ground that they do not support a finding of subject matter

jurisdiction. *Miranda,* 133 S.W.3d at 226. When as here a plea to the jurisdiction challenges the existence of jurisdictional facts, the court considers the relevant evidence submitted by the parties to resolve the jurisdictional issues. *Id.* at 227. If the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court should rule on the plea to the jurisdiction as a matter of law. *City of Elsa,* 325 S.W.3d at 626 (citing *Miranda*, 133 S.W.3d at 228). However, if the evidence creates a fact question whether the Act applies to the plaintiff's case, the trial court should deny the plea to the jurisdiction. *Id.*

The Whistleblower Act forbids a governmental entity from terminating the employment of "a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." TEX. GOV'T CODE ANN. § 554.002(a) (West 2012). The Act provides that "a report is made to an appropriate law enforcement authority if the authority is a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to: (1) regulate under or enforce the law alleged to be violated in the report; or (2) investigate or prosecute a violation of criminal law." *Id.* § 554.002(b).

DISD and Connally do not dispute that Connally was a "public employee" within the meaning of the Whistleblower Act. Further, Connally does not claim that she made her reports to any law enforcement authorities with the power to regulate under or enforce the laws alleged to have been violated in her reports, or that she made her reports to any authority capable of prosecuting her allegations. Therefore, only two questions remain: (1) whether Connally made her reports to an appropriate law enforcement authority authorized to investigate her allegations;

11

and (2) whether her reports contained sufficient allegations that criminal law violations had been committed by DISD employees.

## ANALYSIS

### Appropriate Law Enforcement Authority

The question whether an employee has made a report in "good faith" to an appropriate law enforcement authority under the Whistleblower Act has both objective and subjective elements. *Univ. of Tex. Sw. Med. Ctr. v. Gentilello,* 398 S.W.3d 680, 683 (Tex. 2013); *see also Texas Dept. of Human Servs. v. Okoli,* 440 S.W.3d 611, 614 (Tex. 2014) (recognizing the Court's consistent refusal "to remove the objective element and protect internal reports to workplace supervisors who lacked the Act's specified powers"). Thus, a plaintiff's belief that he or she reported a violation of the law to an appropriate law enforcement agency, no matter how sincere, must not only be made in good faith, but must be "objectively reasonable" as well. *Gentilello,* 398 S.W.3d at 687.

In this regard, the Supreme Court has repeatedly held that "an entity capable only of disciplining its employees internally is not an 'appropriate law enforcement authority' under the Act." *Id.* (university professor's report of alleged Medicare and Medicaid violations to a university department chair, who only had authority to conduct internal investigations involving employee misconduct, was insufficient to meet the requirements of the Whistleblower Act). Instead, the reported-to entity must have outward-looking powers to investigate violations of law against third parties outside of the entity itself. *McMillen v. Texas Health & Human Servs. Comm'n,* 485 S.W.3d 427, 429 (Tex. 2016) (per curiam) (citing *Gentilello,* 398 S.W.3d at 686). Further, the reported-to authority must have the power to investigate violations of criminal law, and if the reported-to authority has no such power, and must instead refer any reports of criminal

12

law violations to an outside agency, then the entity does not qualify as an appropriate law enforcement authority. *Office of Attorney Gen. v. Weatherspoon,* 472 S.W.3d 280, 282 (Tex. 2015) (when "an employee reports wrongdoing internally with the knowledge that the report will have to be forwarded elsewhere for regulation, enforcement, investigation, or prosecution, then the employee is not reporting 'to an appropriate law enforcement authority'") (citing *Okoli,* 440 S.W.3d at 616); *see also Texas Comm'n on Envtl. Quality v. Resendez,* 450 S.W.3d 520, 523 (Tex. 2014) (mere investigatory power is insufficient for an entity to be considered an appropriate law-enforcement authority, because the Act requires the entity have the power to investigate criminal violations against third parties). Also in order to invoke the Whistleblower Act, the reported-to entity must have the authority to investigate the particular criminal conduct reported by the employee. *McMillen,* 485 S.W.3d at 429 (authority's power must pertain to "the law alleged to be violated in the report").

### Connally's Reports to OPR, IA, and PSO

In the trial court, Connally argued extensively that she believed that the various DISD departments to which she made her reports, including the OPR, IA, and PSO, were appropriate law-enforcement authorities under the Whistleblower Act. Connally has abandoned that argument on appeal, and now claims that the DISD police department and Jeremy Liebbe, in his status as a commissioned police officer, were the only appropriate law enforcement authorities to whom she made her reports. Connally, however, continues to discuss at length the adequacy of the reports she made only to OPR, IA, and PSO, asserting that those reports contained sufficient factual allegations to support a finding that Coach W. and other DISD employees had engaged in criminal law violations. In effect, as DISD points out, Connally has "grouped" all of her reports

13

together—most of which were made to the DISD departments—and generally proclaims that her reports fulfilled the necessary requirement under the Act that her reports contained allegations of criminal law violations committed by DISD employees. While these reports may have contained sufficient allegations that the DISD employees violated criminal laws, that standing alone does not assist Connally unless she can also demonstrate that the reports were made to an appropriate law enforcement authority with outward-facing authority to investigate the violations of those particular criminal laws against third parties. *McMillen,* 485 S.W.3d at 429. But, as admitted by Connally, none of the DISD Departments had any outward-facing law-enforcement authority to investigate allegations of criminal wrongdoing against third parties, and were therefore not appropriate law enforcement authorities to which to make her reports under the Whistleblower Act.

### The DISD Departments (OPR, IA, and PSO)

OPR was initially created by DISD in 2007 to detect and prevent fraud, waste, and abuse by DISD employees. At its inception, OPR was tasked with conducting ethics and integrity training for DISD employees, and with conducting internal investigations of employee misconduct, including allegations of "fraud, falsification of documents, and forgery" of documents, which could include falsification of the PAPF and home visitations forms in question. However, OPR's investigations were strictly internal and administrative in nature, and it had no authority to conduct criminal investigations against third parties. *See Mullins*, 357 S.W.3d at 189.

Shortly before Connally made her first formal report of wrongdoing to OPR in February 2014, OPR merged with IA, which is tasked with, among other things, conducting investigations of employee misconduct relating to financial fraud, waste, and abuse within DISD. Like the

OPR, however, IA's authority is limited to conducting internal and administrative investigations involving DISD employees, and it has no authority to conduct criminal investigations involving third parties.

Around this same time, DISD created the PSO, which in effect took over OPR's responsibility for conducting internal investigations of "employee misconduct or unprofessional behavior[.]" PSO's primary role is to conduct internal, administrative investigations involving allegations of employee misconduct, and to issue reports for DISD management officials to determine whether disciplinary action is warranted. The PSO has the authority to conduct investigations of violations of UIL rules, ethical violations, and instances of "non-financial fraud," including allegations that school district records have been falsified, altered, or forged. If criminal violations are reported or discovered during an investigation, the PSO may refer the matter to an appropriate law enforcement agency, which could include the Dallas police department. The PSO, however, has no independent authority to engage in a criminal investigation itself, although it is permitted to continue to conduct a "parallel" or "concurrent" administrative investigation into the same matter while another authority conducts a criminal investigation, and it may work together with the agency investigating the criminal side of a case. Although a PSO report might ultimately include findings that an employee engaged in "alleged criminal violations," it has no power to take any action against the employee for its alleged crimes, other than to recommend internal discipline of the employee or to recommend referring the matter to law enforcement for prosecution. And finally, like the OPR and IA, the PSO has no outward-looking authority to investigate any criminal law violations against third parties.

15

Prior to the DISD's decision to transfer OPR's authority to the PSO, the Dallas Court of Appeals discussed the limited nature of the OPR's authority, and concluded that it was not an appropriate law enforcement authority to which to report an employee's allegations of criminal wrongdoing under the Whistleblower Act in light of its limited authority to conduct only internal, administrative investigations involving DISD personnel. *See Mullins,* 357 S.W.3d at 189. Although *Mullins* discussed only the limitations on OPR's authority, its reasoning is equally applicable to OPR's successor agency, PSO, as well as to the IA. None of these departments had any outward facing authority to investigate criminal law violations against third parties, and were at all relevant times empowered to conduct only internal administrative investigations limited to the actions of DISD personnel. Moreover, given her training and almost two decades of experience working with DISD, Connally could not have reasonably believed that any of those three departments had the authority to conduct anything other than an internal fraud investigation, and she therefore could not have had a good faith belief that they were appropriate law enforcement authorities to which to make reports under the Whistleblower Act. *See Univ. of Houston v. Barth*, 403 S.W.3d 851, 858 (Tex. 2013) (given the legal training and experience of the plaintiff, who was a university professor and a practicing attorney, he could not have reasonably believed in good faith that the university's CFO, general counsel, internal auditor, or associate provost, had the authority to investigate or prosecute plaintiff's allegation that a college dean was allegedly mishandling funds).

**Connally's Reports to Jeremy Liebbe**

Connally now appears to acknowledge that the PSO itself was not an appropriate law enforcement authority to make reports under the Whistleblower Act. She nevertheless contends

16

she had a good faith belief that the PSO's manager, Jeremy Liebbe, in his capacity as a commissioned peace officer, was an appropriate law enforcement authority to whom to report her allegations of wrongdoing, noting that she made multiple reports to Liebbe of criminal wrongdoing, provided him with documentation of her allegations, and worked with him closely throughout his investigation.[6] Connally points out that Liebbe took the position as PSO's manager in January 2014, only weeks before she made her first formal report to him in February 2014, and that prior to that time, Liebbe had served as a commissioned police officer and detective with the DISD Police Department. Connally further contends that during her many years with DISD, she knew Liebbe as a commissioned DISD police officer, had worked with Liebbe in that capacity on prior occasions, and had seen him wearing a "full police uniform" during that time.

Connally also finds it significant that DISD agreed to continue to carry Liebbe's commission with the DISD police department after he took the position of PSO manager, which she claims confirmed her belief that Liebbe was still authorized to conduct criminal law investigations of the nature she reported to him. Although Connally acknowledges that DISD only allowed Liebbe to retain his commission until mid-April 2014, she points out that even after that time, Liebbe "continued to consult with commissioned investigators from the DISDPD regarding criminal investigations" and related criminal matters. Connally argues that, in light of Liebbe's alleged "dual role" as both PSO manager and as an "investigator," and in light of her past experience working with Liebbe as a commissioned police officer, she had a good faith belief that Liebbe was an appropriate law enforcement authority to whom to make her reports. She further

---

[6] DISD argues that Connally is seeking to somehow "transform" the PSO into an appropriate law-enforcement agency due to its hiring of a commissioned police officer as its manager. Connally's argument, however, appears to be focused solely on whether Liebbe independently had the authority to investigate her claims of criminal wrongdoing, based on his status as a commissioned police officer.

asserts that "any other reasonably prudent employee in similar circumstances would have believed the same." We disagree for a number of reasons.

First, the fact that Liebbe may have continued to "consult" with the DISD police department after he lost his commission, as suggested by Connally, is irrelevant to our analysis. Many individuals may consult with a police department, but that does not give those individuals any authority to conduct their own criminal investigations, nor does it elevate them to the status of an appropriate law enforcement authority under the Act.

Second, we disagree that regardless of Liebbe's employment status, he had the authority to conduct investigations of any criminal wrongdoing reported to him based solely on the fact that he was a commissioned peace officer. In this regard, Connally cites Article 2.13 of the Texas Code of Criminal Procedure, which provides that it is the "duty of every peace officer to preserve the peace within the officer's jurisdiction," as well as Article 2.12, which provides that commissioned school district police officers are generally considered peace officers. TEX. CODE CRIM. PROC. ANN. arts. 2.12 (West Supp. 2016), 2.13 (West 2005). She concludes that under these statutes, Liebbe had the general power, if not the duty, to accept her reports of criminal wrongdoing. While we recognize that Texas law gives peace officers, including school district police officers, broad authority to take action to preserve the peace and to arrest individuals when they have reason to believe that a person has committed a "breach of the peace" or a felony offenses, Liebbe was not faced with any such situation requiring or authorizing him to take action under the facts of this case. *See* TEX. CODE CRIM. PROC. ANN. art. 14.03 (West Supp. 2016) (setting out the authority of peace officers).

Further, Connally has cited no law, and we aware of none, that would give an individual police officer who is commissioned through a police agency, the unfettered authority to conduct an investigation of any nature he chooses without the permission or authority from the agency that employees him. Even though Liebbe briefly held his commission with the DISD police department when Connally first made her reports to him, there is nothing in the record to suggest that the DISD police department had authorized Connally to continue to investigate criminal law violations after he gave up his position as a department detective to assume the position of PSO manager. Further, there is no evidence that the DISD Board of Trustees envisioned that Liebbe would continue to be authorized to conduct criminal investigations on behalf of the police department after he left his post with the department to assume the PSO manager position. *See* TEX. EDUC. CODE ANN. § 37.081(a), (d), (e) (West Supp. 2016) (the board of trustees of any school district has the authority to determine a commissioned officer's "jurisdiction" and its "law enforcement duties for the school district").

Connally nevertheless argues that we should be satisfied solely with the fact that Liebbe was a commissioned peace officer, contending that an individual's status as a police officer is all that is needed to render the individual an appropriate law enforcement authority under the Whistleblower Act. Connally believes that a court should look to the particular *individual* to whom a report is made, and that virtually any individual peace officer, regardless of the officer's connection to any particular entity, is an appropriate law enforcement authority to which an employee is entitled to make a report under the Act. This belief is misplaced.

The Whistleblower Act expressly states that a report is properly made to "an appropriate law enforcement authority *if the authority is a part of a state or local government entity* . . . that the

19

employee in good faith believes is authorized to . . . investigate or prosecute a violation of criminal law." TEX. GOV'T CODE ANN. § 554.002(b)(2) (emphasis added). Thus, in determining whether a report was properly made to an appropriate law enforcement authority, it is the *entity's* authority to investigate allegations of criminal wrongdoing that must be the focus of the court's inquiry, and the individual to whom a report is made must be a "part of" that entity. *See, e.g., Robertson County v. Wymola,* 17 S.W.3d 334, 340-41 (Tex.App. – Austin 2000, pet. denied) (the term "authority" as used in the Act refers to the governmental entity receiving the report, rather than to the individual within the entity); *see also Hunt County Cmty. Supervision & Corr. Dep't v. Gaston,* 451 S.W.3d 410, 421 (Tex.App. – Austin 2014, pet. denied) (individual to whom report is made must be "part of" the relevant governmental entity that has authority to conduct the investigation).

Contrary to Connally's argument, the Supreme Court in *Gentilello* did not hold otherwise. Instead, the Court repeatedly stated that a report must be made to an "entity" that has the "authority to enforce, investigate, or prosecute violations of law against third parties outside of the entity itself[.]" *Gentilello*, 398 S.W.3d at 686. Moreover, in the hypothetical example given by the Court, the police officer to whom the report was made was in fact "part of" an entity—the police department—that was authorized to conduct external investigations of criminal law violations against third parties.[7] *Id.*

In *Okoli*, the Court provided even more guidance on this subject. In that case, an employee of the Texas Department of Human Services (now known as Texas Health & Human Services Commission) reported to a supervisor in the agency that he believed another agency

---

[7] In *Gentilello*, the Court discussed a hypothetical situation in which a police officer made a report to a supervisor on the police force—who was also a police officer—accusing a fellow officer of dealing narcotics. 398 S.W.3d at 686. The Court noted that, although technically speaking such a report would be made "internally," it nevertheless was properly made to an individual within the police department, who had the outward-facing authority to investigate a narcotics violation against not only the fellow officer but also against third parties as well. *Id.*

20

employee was falsifying Medicaid documents. *Okoli*, 440 S.W.3d at 617. In making its determination that the report did not fall within the scope of the Whistleblower Act, the Supreme Court explained that the plaintiff could have, but did not, make his report to the agency's OIG division, which had outward-looking enforcement authority and would have qualified as an appropriate law enforcement authority under the Act. However, the Court noted that the supervisor to whom the plaintiff made his report was not located in the OIG division, and therefore did "not work within a governmental arm" charged with conducting a criminal investigation of Medicaid fraud. The Court made it clear that it is the governmental arm or entity to which the report is made that is the key focus, and that any report must be made to an individual within that governmental arm or entity. *Id.* As such, the focus is not on an individual's general status as a peace officer, but whether the individual is "part of" a governmental arm or entity authorized to conduct criminal law investigations. *See also McMillen*, 485 S.W.3d at 430 (OIG attorney's report of alleged Medicaid fraud being committed by the agency could have been made to virtually any individual who was a part of the OIG division of the agency, in light of the OIG's "outward-looking law-enforcement authority" to investigate Medicaid fraud against third parties); *see also Weatherspoon,* 472 S.W.3d at 283 (when only some divisions within an agency have outward-looking law-enforcement authority, a report under the Whistleblower Act must have been made to the appropriate division within the agency having that power).

In order to qualify as an appropriate law enforcement authority under the Whistleblower Act, Liebbe had to be "part of" a governmental arm or entity within DISD that had outward-facing authority to investigate criminal law violations against third parties. In the absence of any evidence to the contrary, we are not convinced that simply because Liebbe briefly retained his

commission with the DISD police department after he left his post with the Department, this meant he was still "a part" of the police department, or that he was otherwise authorized to conduct investigations of criminal violations against third parties on behalf of the DISD police department.[8]

We therefore conclude that Liebbe was not acting in his capacity as a commissioned peace officer or as part of the DISD police department when he accepted and investigated Connally's reports of wrongdoing, and that accordingly Connally could not have had an objective good faith belief that Liebbe had the authority to institute a criminal investigation or that he was an appropriate law enforcement authority.

### Connally's Reports to the DISD Police Department

We must now analyze the reports Connally made to the DISD police department through two different DISD police officers, Chief Craig Miller and Assistant Chief Gary Hodges. Connally correctly asserts, and DISD does not disagree, that the DISD police department has the authority to investigate Penal Code violations occurring within its jurisdiction involving both DISD employees as well as third parties. Further, Connally provided evidence that the DISD Board of Trustees has given the DISD police department full authority to act within its boundaries to "exercise authority and powers as Texas peace officers and . . . to enforce all laws in accordance with the provisions of the Texas Code of Criminal Procedure, the Texas Education Code, Penal

---

[8] There is also nothing in the record to suggest that Connally consulted with Liebbe in his capacity as a peace officer or that Connally asked Liebbe to initiate a criminal investigation in any capacity. Instead, based on her own evidence, it appears that Connally contacted Liebbe solely in his capacity as the newly-anointed PSO manager for the sole purpose of initiating an internal PSO investigation. Nor is there anything in Liebbe's affidavit to suggest he consulted with Connally in his capacity as a police officer or as part of the DISD police department, or that Connally ever requested that he launch a criminal investigation.

Code, and Family Code."[9]   Connally provided the trial court with an affidavit from Liebbe explaining the types of allegations that he had investigated while on the DISD police force, which included investigations of "DISD employees, DISD students, and third parties where the DISDPD had jurisdictional authority[.]"   Liebbe also explained in his affidavit that the DISD police department has the authority to investigate virtually all violations of criminal laws occurring within its jurisdictional boundaries, including but not limited to those set forth in the Texas Penal Code, and that while he was on the force, his criminal investigations included fraud.

DISD has not presented any argument or evidence that the DISD police department's authority does not extend to violations Connally claims she reported, including claims of tampering with a governmental record and forgery of school records, in violation of Sections 37.10 and 32.21 of the Texas Penal Code. *See Okoli*, 440 S.W.3d at 615 (recognizing that in its prior holding in *Barth*, a plaintiff's report to university police, accusing university employees of engaging in criminal law violations, including Tampering with a Governmental Record in violation of Section 37.10 of the Texas Penal Code, "may have been sufficient" under the Act, if reports had been made prior to university's retaliatory actions against the plaintiff).   In fact, DISD appears to agree that the DISD police department has the outward-facing authority to investigate "certain" criminal law violations involving third parties.   DISD's primary contention is that Connally did not make a sufficient report of a criminal law violation to Miller or Hodges, and that

---

[9] Article 2.12(8) of the Texas Code of Criminal Procedure provides that "officers commissioned under Section 37.081, Education Code" are considered "peace officers."   TEX. CODE CRIM. PROC. ANN. art. 2.12(8).   In turn, Section 37.081 of the Education Code provides that an officer commissioned under section 37.081 as a school district police officer, has the powers, privileges, and immunities of peace officers and may enforce all laws, including municipal ordinances, county ordinances, and state laws, subject to any limitations imposed by the district's Board of Trustees.   TEX. EDUC. CODE ANN. § 37.081(b)(1, 2), (e).

the evidence she presented of her reports were too vague and conclusory to allow the trial court to determine exactly what she allegedly reported to them.

Consequently, the only remaining question is whether Connally's evidence of the reports she made to the DISD police department provided a sufficient factual basis to conclude that Connally reported criminal law violations to that Department. The parties agree that Connally had two separate conversations with the Chief of the DISD police department (Miller) and the Assistant Chief (Hodges) sometime in September or October 2013 that touched on the subject of DISD wrongdoing. The parties differ greatly, however, on exactly what Connally reported to them. Unfortunately, Connally did not make a written report to either Miller or Hodges setting forth her suspicions of wrongdoing, and Miller and Hodges neither prepared a written report, nor entered Connally's allegations into their computerized reporting system. The only evidence of what Connally may have reported to Miller and Hodges is found in their competing and conflicting affidavits.

### Connally's Affidavit

In her affidavit, Connally first described what she had observed at the September 4, 2013 DEC meeting. She stated that during that meeting, she witnessed "a coach at DISD's Madison High School and parent of a student athlete appear[] before the committee to present documents related to his son's move to the Madison High School zone," which included a lease agreement and a home visitation form as proof of residency that he lived in the Madison High School attendance zone. Connally elaborated that she "believed strongly that both the lease and the home visit form seemed to be fraudulent and [she] raised questions at the DEC meeting" about them. She indicated that later, at an unspecified date and time, she conducted her own research, looking

24

at the Dallas County Appraisal District records, and noted that the coach still had a home in Desoto outside the Madison High School zone. After examining the documents submitted by the coach, including the PAPF form, Connally suspected the coach's documents were "fraudulent, forged, or falsified."

After reporting the matter to the OPR, Connally averred that she spoke with both Miller and Hodges on separate occasions in either September or October 2013, and "reported what [she] had seen at the September 4, 2013 DEC meeting." Connally stated she also reported to Hodges and Miller that she "thought there existed a problem in DISD generally with parents and coaches falsifying addresses on home visit forms for athletic purposes." Connally stated that she "genuinely and in good faith believed the problems with parents and coaches falsifying addresses on home visit forms would constitute a violation of law, policy and UIL rules." Based on her experience in working for the District, she expressed her belief that the DISD police department had "law enforcement authority" to investigate "suspected fraud and falsification of District documents."

### *The Miller and Hodges Affidavits*

Miller and Hodges both provided affidavits in which they averred that Connally "never made any oral or written report to [them] about any violation of law—much less a violation of any criminal law—by any member of Dallas ISD's Athletics Department or a Dallas ISD athletic coach or coordinator." Miller stated, however, that he did "vaguely recall" one instance in which he passed Connally in the hall, and she made a reference to "'crazy stuff going on' in athletics," but Miller claims that Connally "did not elaborate and provided . . . no specific information" to him to explain her statement.

25

Hodges also recalled one occasion when Connally came to his office and "said something to the effect that she 'tried to warn these people.'" Hodges averred, however, that he did not recall anything specific about this remark. Hodges also recalled that Connally made a "passing comment . . . to express frustration about a DEC meeting" during their conversation, but he did not recall that she ever explained the source of her frustration to him. Hodges averred that Connally never expressed any belief that DISD personnel were engaging in falsification or forgery, or any other criminal misconduct, and he did not consider any of Connally's general comments to him to constitute a report of criminal wrongdoing. Hodges explained that if Connally had reported a crime to him, he would have "directed a Dallas ISD Police Officer to make a report," and in turn, the officer "would have obtained witness names and document everything Ms. Connally, as the complainant, said and reported." Hodges further explained that the officer's report would have then been placed in their Automated Report Management System (ARMS). However, there was nothing in the ARMS system concerning Connally's alleged report.

**Connally made an Adequate Report of a Criminal Violation**

DISD argues that because Hodges and Miller did not consider Connally's conversations to be formal police reports, and did not treat the conversations as reports, we should similarly conclude that they did not rise to the level of a "report" under the Act. We disagree. Merely because Hodges and Miller did not perceive Connally's conversations to be formal "reports" for purposes of entering her information into the Department's computerized ARMS system, does not necessarily require the conclusion that Connally did not make a valid report for purposes of the Whistleblower Act. As our sister court has noted, while the Act requires a whistleblower plaintiff to establish that she has reported a violation of law, this does not necessarily require the plaintiff to

26

establish that she made a formal report. Instead, a report under the Act may be considered "any disclosure of information regarding a public servant's employer tending to directly or circumstantially prove the substance of a violation of criminal or civil law[.]" *Castaneda v. Texas Dep't of Agric.,* 831 S.W.2d 501, 503–04 (Tex.App. – Corpus Christi 1992, writ denied) (superseded by statute on other grounds).

Moreover, the Dallas Court of Appeals, whose precedent we must follow, has repeatedly indicated that a report of criminal wrongdoing need not be formal, and that a report is sufficient even if it does not specify the exact law being violated so long as his report provided a factual basis to support a violation of law. *Mullins,* 357 S.W.3d at 188; *Wilson v. Dallas Indep. Sch. Dist.*, 376 S.W.3d 319, 323 (Tex.App. – Dallas 2012, no pet.); *see also Coll. of the Mainland v. Meneke,* 420 S.W.3d 865, 870 (Tex.App. – Houston [14th Dist.] 2014, no pet.); *Tex. Dep't of Criminal Justice v. McElyea,* 239 S.W.3d 842, 850 (Tex.App. – Austin 2007, pet. denied). The key question is not so much how the whistleblower plaintiff worded her report, but whether there was in fact some law prohibiting the complained-of conduct described in the report. *Mullins*, 357 S.W.3d at 188 (citing *Llanes v. Corpus Christi Indep. Sch. Dist.,* 64 S.W.3d 638, 642 (Tex.App. – Corpus Christi 2001, pet. denied)).

Accordingly, we analyze Connelly's description in her affidavit of the reports she made to Miller and Hodges to determine if those reports provided a sufficient factual basis to conclude that Connally reported that a DISD employee had committed the offense of Forgery or Tampering with a Governmental Record.

### *Forgery*

Connally contends she provided sufficient factual information to Miller and Hodges to support a conclusion that Coach W. and other DISD personnel had engaged in the crime of Forgery in violation of Section 32.21 of the Texas Penal Code. "[10] We disagree. Section 32.21 of the Code provides that the term "forge," means: "(A) to alter, make, complete, execute, or authenticate any writing so that it purports: (i) to be the act of another who did not authorize that act; (ii) to have been executed at a time or place or in a numbered sequence other than was in fact the case; or (iii) to be a copy of an original when no such original existed . . .[.]" Tex. Penal Code Ann. § 32.21(a)(1)(A) (West 2011). In her affidavit, Connally's did not describe any actions by Coach W. or any other DISD employee that would fit within the statutory definition of "forgery." In particular, Connally never alleged that any DISD employee signed documents purporting to do so on behalf of another individual, that any DISD employee misrepresented the "time or place" of the execution of any documents, or that any documents were copies of non-existent originals.

At most, Connally made a general statement that she informed Miller and Hodges that she believed Coach W. may have presented "forged" documents to the DEC Committee at the September 4, 2013 meeting. However, she provided no indication why she believed the documents were "forged," and provided no facts supporting that belief. We conclude that, even viewing Connally's affidavit in a light most favorable to her, her affidavit was insufficient to create a fact question that she made a report to Miller and Hodges that DISD employees had committed the offense of "forgery."

## Tampering With a Governmental Record

---

[10] Although the PSO investigation report found that Coach W. and other DISD employees had engaged in "fraud by forgery," the basis for this finding is unclear.

28

Connelly next contends the reports she made to Miller and Hodges contained sufficient factual information to support a conclusion that Coach W. or other DISD personnel had violated Section 37.10 of the Texas Penal Code, Tampering with a Governmental Record. Tampering with a Governmental Record can be committed in a variety of ways, including when a person "(1) knowingly makes a false entry in, or false alteration of, a governmental record; . . . or (5) makes, presents, or uses a governmental record with knowledge of its falsity[.]" TEX. PENAL CODE ANN. § 37.10(a) (West Supp. 2016). Although DISD appears to acknowledge that student residency forms, once filed with the district, are governmental records for purposes of the Act,[11] DISD contends that the records that Coach W. presented at the September 2013 meeting had not yet been filed when he and the other DISD coaches allegedly provided false information on them. DISD therefore argues that Connally did not report a violation of subsection (a)(1) of the Code, which requires that a person must make a false entry on a document that is already considered to be a governmental record.

While DISD is correct that the coaches' conduct, as described by Connally, would not constitute a violation of subsection (a)(1), subsection (a)(5) of the Code, unlike subsection (a)(1), does not require that the forms already be government records at the time the false information is entered. Instead, under subsection (a)(5), a defendant commits an offense if he makes a false entry on a document that he later presents or uses as a governmental record. As the Court of Criminal Appeals recognized in *State v. Vasilas*, 187 S.W.3d 486, 491 (Tex.Crim.App. 2006), an attorney who entered false information in a petition to expunge a marijuana charge for his client,

---

[11] The Penal Code expressly provides that school records, and school residency records in particular, once filed with the school, are considered to be governmental records. TEX. PENAL CODE ANN. § 37.10(c)(3) (providing it is a Class C misdemeanor when shown the "governmental record is a governmental record that is required for enrollment of a student in a school district and was used by the actor to establish the residency of the student").

and then presented the petition to the court for filing as a governmental record, could be prosecuted for Tampering with a Governmental Record under section (a)(5), even though the petition was not a governmental record at the time the attorney made the false entries. We also reached a similar conclusion in *Morales v. State*, 11 S.W.3d 460, 463 (Tex.App. – El Paso 2000, pet. ref'd), in which we held that even if a petition containing signatures for placement on the ballot was not a governmental record when it was falsified, it later became a governmental record for purposes of a prosecution under subsection (a)(5), after it was accepted by the party chairperson. Similarly, we agree with Connally that merely because the residency forms had not yet been filed with the district before they were allegedly falsified or altered by DISD personnel does not prevent them from being considered governmental records under subsections (a)(5).

DISD next argues that Connally's own description of what she reported to Miller and Hodges was too vague and conclusory to support any conclusion that Coach W. or other DISD personnel did in fact present falsified documents to the district for filing with knowledge of their falsity or with the intent that they be accepted by the district as genuine. We disagree.

Although Connally's affidavit was not a model of clarity, it provided a sufficient basis from which Miller and Hodges could have concluded that Coach W. had in fact presented falsified residency forms to the district for filing at the September 4, 2013 DEC meeting. In her affidavit, Connally described what she had observed at the September 4, 2013 DEC meeting, including Coach W.'s presentation of what she believed were falsified residency forms and documents. According to Connally's description, she also observed Coach W. present what she believed was a falsified Home Visitation Form to the DEC committee, which, as discussed above, was required to be signed by another DISD coach, certifying that he had visited Coach W.'s new home to verify

30

his residency. Subsequently in her affidavit, Connally states that she thereafter reported to both Miller and Hodges "what [she] had seen at the September 4, 2013 DEC meeting." Although, as DISD points out, she did not directly state how much detail she provided to Miller and Hodges about her observations of the DEC meeting in those paragraphs, viewing the affidavit as a whole and in the light most favorable to Connally, we construe her affidavit to mean that she informed Miller and Hodges of her observations of the DEC meeting, as described in the earlier paragraphs of her affidavit. In turn, we conclude that the description provided in those earlier paragraphs provided a sufficient factual basis to conclude that Coach W. had presented falsified documents to the DEC committee for filing as school records. As Miller and Hodges were not only DISD employees, but also commissioned peace officers, they were presumably aware that the residency forms that the DISD coaches had signed and presented at the meeting were considered governmental records for purposes of Section 37.10 of the Penal Code, and that Connally's report suggested that DISD personnel had presented falsified governmental records for filing with the district in violation of the Penal Code.

DISD also argues that even if Connally's affidavit is taken as true, she did not make a full report of all of the elements of the crime of Tampering with a Governmental Record because she did not expressly state that she told Hodges or Miller that she believed DISD employees were acting in a knowing or intentional manner, as required by the Penal Code.[12] We disagree with this argument for two reasons.

First, based on Connally's description of what occurred at the DEC meeting, it would have been apparent to any individual familiar with the DEC process that Coach W. had presented

---

[12] Connally alleged in her amended petition that she reported to Miller and Hodges that "someone had presented the enrollment records and PAPF at the [September 4, 2013] DEC meeting knowing they were false and with the intent that DISD take the records as genuine."

31

residency forms with the intent that the forms be accepted by the DEC Committee as true, so that ultimately, DISD would allow his son to play varsity sports at Madison High School. Connally was not required to use the same terms as used in the statute—*i.e.,* "knowledge of its falsity," or the "intent that it be taken as a genuine governmental record." The key issue is whether the facts Connally reported to Miller and Hodges, as described by Connally in her affidavit, would have provided a sufficient "factual basis" to support an inference that Coach W. provided false information to the DEC Committee with the requisite knowledge and intent.

Significantly, knowledge and intent may be inferred from the facts surrounding a defendant's presentation of falsified information on a document submitted for filing as a governmental record. *See e.g., Tottenham v. State*, 285 S.W.3d 19, 28 (Tex.App. – Houston [1st Dist.] 2009, pet. ref'd) (constable's conviction for Tampering with a Governmental Record was upheld where the evidence demonstrated that the defendant had filled out training certificates with patently false information and had presented those documents to a county judge as proof he had completed necessary training for his position). As the court in *Tottenham* noted, in most cases involving a charge of Tampering with a Governmental Record, there will be no "direct evidence" of a defendant's mental state when the defendant presents a form for filing, and therefore "proof of a culpable mental state almost invariably depends on circumstantial evidence." *Id.* (citing *Dillon v. State,* 574 S.W.2d 92, 94 (Tex.Crim.App. 1978)). So too, we conclude that the information Connally provided to Hodges and Miller supported an inference that Coach W. and the other DISD personnel were acting with the requisite knowledge and intent when they presented allegedly falsified documents to the DEC Committee for its review and approval.

Connally also stated in her affidavit that she reported to Miller and Hodges her belief that a more pervasive problem existed in "DISD generally with parents and coaches falsifying addresses on home visit forms for athletic purposes." While standing alone this general report is somewhat vague, when considered in conjunction with Connally's more specific report of what she observed at the September DEC meeting at which Coach W. provided falsified information to the DEC Committee, it is apparent that Connally was attempting to convey that Coach W.'s actions were not isolated acts, and that other similar actions were occurring within the district on a more widespread basis. Although her report to Miller and Hodges did not name the other individuals Connally believed might be involved in the wrongdoing, her report was sufficient to apprise Miller and Hodges of her suspicion of what were widespread criminal law violations occurring within DISD in which athletic personnel were tampering with governmental records in violation of the Penal Code. Viewed in its totality, we therefore conclude Connally's communications with Miller and Hodges constituted sufficient reports of criminal violations within the meaning of the Whistleblower Act.[13] *See McMillen*, 485 S.W.3d at 429 (OIG attorney's report of alleged Medicaid Fraud being committed by the agency on a systemic basis was held to be a report within the meaning of the Whistleblower Act).

## CONCLUSION

We sustain in part Connally's issues on appeal. We reverse the trial court's order granting DISD's plea to the jurisdiction to the extent it dismissed that portion of Connally's Whistleblower

---

[13] In light of our ruling, we do not address Connally's assertion that the trial court erred in sustaining DISD's objection to the statement in her affidavit that she believed in good faith that Coach W.'s actions were violations of law, because it was conclusory. The key issue in determining whether Connally made a valid report is not her subjective belief, but whether she presented sufficient facts showing she reported a criminal law violation. *Mullins*, 357 S.W.3d at 188 (citing *Llanes,* 64 S.W.3d at 642). Consequently, the trial court's refusal to consider Connally's statement about her subjective belief was irrelevant to its ultimate decision concerning the validity of her reports.

claim as it relates to her reports Tampering with Governmental Record to Miller and Hodges.   We

remand that portion of Connally's Whistleblower claim to the trial court for further proceedings in

accordance with this opinion.   In all other respects, the trial court's order is affirmed.

STEVEN L. HUGHES, Justice

December 21, 2016

Before McClure, C.J., Rodriguez, and Hughes, JJ.