**DISSENT and Opinion Filed August 29, 2022**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-20-00945-CV

## CITY OF DENTON, Appellant
## V.
## MICHAEL GRIM AND JIM MAYNARD, Appellees

**On Appeal from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-08139**

## DISSENTING OPINION

Before Justices Molberg, Pedersen, III, and Smith
Opinion by Justice Pedersen, III

I respectfully dissent. As a straightforward matter of statutory construction, the Texas Whistleblower Act (the Act) does not apply.[1] I dissent from the majority's conclusion that City Council Member Keely Briggs was an "employing governmental entity" within the meaning of the Act. As part of this ground of dissent, I disagree with the majority's incorrect statutory construction, as it widens

---

[1] Appellees asserted claims against the City under the Texas Open Meetings Act and the Texas Whistleblower Act in their original petition. After amendment, appellees removed their claims under the Texas Open Meetings Act.

the Act's considered and limited waiver of sovereign immunity. Consequently, I would dismiss the case on this first ground.

If the Act applied, I would dissent because the majority fails to apply controlling Texas Supreme Court precedent, *Office of the Attorney General of Texas v. Rodriguez*, 605 S.W.3d 183 (Tex. 2020). *Rodriguez* demonstrates there is insufficient evidence of but–for causation. Hence, I would reverse the trial court's judgment and render judgment in favor of appellant on this second ground.

## Analysis

### *Inapplicability of the Texas Whistleblower Act*

We review statutory construction de novo. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). The legal question in this case is whether Keely Briggs's leaking information—in these circumstances—is clearly and unambiguously conduct the Legislature intended to fit within the Act's limited waiver of sovereign immunity. It is not.

### *The Act*

We recently discussed the Texas Whistleblower Act:

The Texas Whistleblower Act contains an immunity waiver which states that "[a] public employee who alleges a violation of this chapter may sue the employing state or local governmental entity for the relief provided by this chapter," and "[s]overeign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter." TEX. GOV'T CODE § 554.0035.

. . .

Under the Act, state or local governmental entities "may not suspend or terminate the employment of, or take other adverse personnel action

–2–

against, a public employee who in good faith reports a violation of law by *the employing governmental entity or other public employee to an appropriate law enforcement authority*." *Id.* § 554.002(a).

*City of Fort Worth v. Birchett*, No. 05-00265-CV, 2021 WL 3234349, at *3–4 (Tex. App.—Dallas July 29, 2021, pet. denied) (mem. op.) (emphasis added).

Thus, to meet the Legislature's limited waiver of governmental immunity, Briggs must have violated the law as an "employing governmental entity" or "another public employee." *Id*. Appellees concede Briggs was not "another public employee."[2] Accordingly, discussion here is limited to whether Briggs was "the employing governmental entity"[3] at the time she handed over the information. Briggs must have operated as "part of the City" when she leaked the information for the Act to apply. *See City of Cockrell Hill v. Johnson*, 48 S.W.3d 887, 895 (Tex. App.—Fort Worth 2001, pet. denied) ("[T]hose adverse personnel actions were not proscribed by the Act unless [an elected official] was part of the City when he committed the alleged legal violations.").

*The parties' case law*

In arguing whether Briggs was acting as an "employing governmental entity" under the Act when she disclosed the information, the parties mainly rely on two

---

[2] The Act defines "public employee" as "an employee or appointed officer other than an independent contractor who is paid to perform services for a state or local governmental entity." TEX. GOV'T CODE ANN. § 544.001(4). It is undisputed that (i) Briggs was not an appointed officer and (ii) Briggs was not paid to perform her duties as a council member for the City.

[3] It is undisputed that the City is a municipality that satisfies the definition of a "local governmental entity" under the Act. *See* TEX. GOV'T CODE ANN. § 554.001(2) (In this chapter . . . "[l]ocal governmental entity means a political subdivision of the state, including a . . . municipality.").

opinions, *Johnson*, 48 S.W.3d 887, and *Housing Authority of City of El Paso v. Rangel*, 131 S.W.3d 542 (Tex. App.—El Paso 2004, pet. granted, judgm't vacated w.r.m.).

*Johnson* applied the appropriate legal standard, focused on whether a city alderman acted within his official capacity when he allegedly violated laws, and stated its issue:

> If an elected official and the employing governmental entity are the same unit when the official is acting in his official capacity, is the official also part of the employing governmental entity when he is not acting in his official capacity?

*Johnson*, 48 S.W.3d at 895. *Johnson* involved an allegation that a city alderman assaulted his girlfriend's daughter in his home and possibly was involved in additional "suspected criminal activity." According to *Johnson*: "[The alderman] would be part of the City's government under the Act if he . . . committed a violation of the law in his official capacity as an alderman . . . ." *Id.* (observing, "There is no allegation or evidence that [the alderman] committed any violation of the law in his official capacity as alderman."). *Johnson* stated:

> [The whistleblower] has not directed us to any cases, and our research has not revealed any, in which a court has held that an elected official is part of the employing governmental entity when he is acting in his private, rather than official capacity. Instead the cases to which the Act has been applied have involved legal violations committed by an official in the scope of the official's duties, or by a public employee.

*Id.* at 895–96 (footnotes omitted).

–4–

*Johnson*, addressing statutory construction and the Act's limited waiver of sovereign immunity, recognized:

> In addition, legislative consent to suit must be by clear and unambiguous language. There is nothing in the plain language of the Act that would indicate clear legislative intent to waive sovereign immunity from suit based on the private acts of elected officials. The Act's provisions are exclusive, and the courts may not add to them.

*Id.* at 896.[4]

The other opinion relied on by all parties, *Rangel*, involved possible application of the Act to two commissioners of a city housing authority. *Rangel* initially stated the correct legal standard:

> An employee's actions taken pursuant to his duties and authorized by state law are considered actions taken by the state. Conversely, acts outside the scope of an employee's official duties are not acts of the State. We thus address whether the acts of [the housing commissioners] were within the scope of their duties as commissioners.

*Rangel*, 131 S.W.3d at 547 (citations omitted). The *Rangel* court considered whether two housing commissioners' acts were taken in the commissioners' official capacities and thus were acts of the "employing governmental entity." *Id.* at 547–49. The first housing commissioner controlled a direct or indirect interest in a housing authority project for pecuniary gain but failed to disclose his interest. *See* TEX. LOC. GOV'T CODE ANN. § 392.042(d) (prohibiting such conduct). *Rangel* held the first

---

[4] *Johnson* does not end here but adds dicta about the remedial purposes of the Act. The dicta relates to the majority's erroneous construction of the Act's limited waiver of sovereign immunity and are discussed below.

commissioner acted in his official capacity in failing to disclose his interest. *Rangel*, 131 S.W.3d at 548.

## *Facts*

Denton (hereafter "the City") has a council–manager form of government wherein the City Council serves as the legislative, policy–making branch. The City manager's office has control over day-to-day operations of the City and its departments.

Keely Briggs served as one of the City's seven elected council members.[5] Briggs obtained information from Interim City Manager Howard Martin. Some of that information, when provided to Briggs, had been separated as confidential. Briggs redacted some information on her own to be "extra careful." Briggs failed to redact all confidential information.

Briggs invited a reporter of the *Denton Record–Chronicle* to her home for the reporter to pick up the documents. Briggs, at her home, turned over some information that she had obtained from Martin to the *Denton Record–Chronicle*. Briggs disclosed the information without the knowledge or approval of City Council. Briggs turned over the information without the knowledge or approval of the Interim

---

[5] At the times relevant to this case, the City's council members were unpaid. *See* TEX. GOV'T CODE ANN. § 544.001(4) ("'Public employee' means an employee or appointed officer other than an independent contractor who is paid to perform services for a state or local governmental entity.").

City Manager Howard Martin. When asked why she released the information to the *Denton Record–Chronicle*, Briggs testified:

> [Briggs]. I just wanted everybody to see what I would see.
> [City's Trial Counsel]. And what was that?
> [Briggs]. Because the things that I saw made me feel so uncomfortable, and no one else was listening.
> [City's Trial Counsel]. Is it your belief that the citizens of Denton have a right to transparency?
> [Briggs]. Yes.
> [City's Trial Counsel]. Was that what you were trying to accomplish, or something else?
> [Briggs]. I was just trying—I was just—I wasn't trying to accomplish anything. I just wanted to share the knowledge that I had and let everybody come from the same place, know where I was coming from.

The *Denton Record–Chronicle* published an article with the information available on its website. Appellees reported Briggs's disclosure to the then–City Attorney, Anita Burgess. Council members expressed dismay at Briggs's disclosing the information. Burgess sent Briggs a memorandum, explaining that due to Briggs's disclosure of the information, the interests of the City and Briggs were "adverse":

> Your release of this information ethically obligates me to advise you that the City organization's interests appear to be inconsistent with yours as it concerns this release, and that your interests appear to be adverse to (he [sic] City. Please understand that, when there is an adversity of interests, a lawyer for an organization cannot provide legal representation for a constituent individual of the organization who is adverse. Furthermore, any discussions between me and my staff and you may not be privileged insofar as they relate to this topic. Finally, it may be in your best interests to consult with an attorney of your choosing regarding this release of information. The City is constitutionally prohibited from paying for this consultation and representation al [sic] at this time.

Burgess sent the remaining six members of the City's council a memorandum, which attached the above-described memorandum to Briggs and provided:

> The City Council is aware of the release of confidential information by one council member to the Denton Record-Chronicle. This release included confidential data in four different categories: [Denton Municipal Electric] competitive information; attorney-client privileged information; information made confidential by virtue of a confidentiality agreement with vendors; and RFP/RFQ information made confidential by state law.

City Council did not ratify or otherwise retroactively approve Briggs's turning over the information. Briggs's disclosure of the information did not result in legal or other adverse action against her.

*Application*

Applying the plain and unambiguous language of the Act, *Johnson*, and *Rangel* to these facts and circumstances, I cannot conclude Briggs was acting in her official capacity or as part of the City when she leaked the information.

Briggs did not act as *a part of* the City—she acted *apart from* the City. Briggs kept her plan secret from other City officials and workers. She did not seek approval or permission from City Council or Martin. There is no evidence that Briggs informed anyone connected with the City of her intended surprise disclosure. Moreover, Briggs excluded others from her plan by taking it upon herself to redact what she guessed might be confidential or sensitive information, although the City had tasked others with making such determinations and producing such documents.

Briggs invited a reporter from the *Denton Record–Chronicle* to her home to disclose the documents. Briggs testified her purpose was purely personal. She made a personal statement, not a statement as a part of the City or on behalf of the City or in her official capacity: "I just wanted to share the knowledge that I had and let everybody come from the same place, know where I was coming from."

When City officials and City employees, including appellees, realized what Briggs had done, they took immediate action. Appellees reported Briggs's leak to City Attorney Burgess. As appellees express in their brief here, they worked with the city attorney on "damage control," including having the *Denton Record-Chronicle* remove the leaked documents. One City Council member called Briggs's disclosure "rogue." Council members expressed dismay at Briggs's disclosure. Burgess soon officially notified Briggs that the City's interests and Briggs's interests were "adverse" and "inconsistent" because Briggs had disclosed the documents. Moreover, the city attorney officially notified the City Council that Briggs's interests were "adverse" and "inconsistent" with those of the City when Briggs disclosed the information. The Denton City Council did not ratify or later approve Briggs's disclosure. These reactions of City officials and City workers hardly evidence that Briggs acted as a part of the City or in her official capacity, quite the contrary.

Based on the evidence at trial, no reasonable fact finder could conclude that Briggs could be considered a part of the City, or as having acted in her official capacity, when she leaked the information. Briggs apparently kept her unofficial

intentions to herself until it was too late for the City to do anything about it. This is consistent with Briggs's statement that she simply wanted people to know where *she* "was coming from." In short, Keely Briggs's actions were unauthorized, unapproved, unannounced, unofficial, and unratified.

The Legislature did not clearly and unambiguously waive sovereign immunity for Briggs's actions in this case. "We may find a waiver of immunity only where legislative intent to waive immunity is clear and unambiguous." *Ellis v. Dallas Area Rapid Transit*, No. 05-18-00521-CV, 2019 WL 1146711, at *2 (Tex. App.—Dallas Mar. 13, 2019, pet. denied) (mem. op.); *see* TEX. GOV'T CODE ANN. § 311.034 ("[A] statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language."). I cannot conclude that the Texas Whistleblower Act clearly and unambiguously waives the City's immunity. *See* TEX. GOV'T CODE ANN. § 554.002; *Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 58 (Tex. 2011) ("[W]hen a waiver of immunity has been necessary to make sense of a statute, we have held it to be clear and unambiguous."). Appellees request we adopt a rule that personally motivated acts of a single council member of a municipality—acting individually and without the knowledge, consent, approval, or ratification of any of the remaining council members or other government official and that were concluded to have been in conflict with and adverse to the interests of the City—may subject the municipality to a waiver of its governmental immunity under the Act. Apart from clear and unambiguous legislative consent to such a rule,

–10–

which is absent here, I cannot adopt appellees' interpretation of the Act. *See* TEX. GOV'T CODE ANN. § 311.034.

*Improper standard in* Johnson*,* Rangel*, and the majority opinion*

I also disagree with the majority because it uses an erroneous legal standard to determine whether Briggs was acting in her official capacity to conclude whether she was an "employing governmental entity."

*Johnson* and *Rangel* state appropriate standards—up to a point. However, *Johnson* added dicta, discussed below, addressing the remedial purposes of the Act. *Rangel*, when considering a second housing commissioner, unfortunately applied *Johnson*'s dicta.

*Johnson*, having determined the alderman was not acting in his official capacity when committing his reported acts, added dicta, not present in the Act, concerning the remedial purpose of the Act, as follows:

> We believe our decision on this issue is in keeping with the Act's remedial purpose of securing lawful conduct on the part of those who direct and conduct the affairs of public bodies. To achieve this purpose, the Act is directed toward public employer's violations of the law that are detrimental to *the public good or society in general*. The legal violations [the alderman] is alleged to have committed in his personal capacity do not relate to the affairs of the City itself. In addition, they were detrimental primarily to the individuals involved, not to society in general. In short, they are not things the public would be concerned about simply because of [the alderman's] status as an elected official.

–11–

*Johnson*, 48 S.W.3d 896 (emphasis in original, footnotes omitted). This dicta—based and developed on the remedial purpose of the Act—constitutes an improper legal standard applied in *Rangel* and relied on by the majority here.

Before proceeding from consideration of *Johnson* to *Rangel*, it is worth bearing in mind the Third Court of Appeals' observation about over-emphasizing the Act's remedial purpose—as occurred in *Johnson* and in *Rangel*—when construing the Act:

> Although the Legislature did not expressly say so in the Whistleblower Act, this Court and various of our sister courts have previously inferred that the Act should be "liberally construed" in light of its "remedial" goal of enhancing openness and legal compliance in government. . . . But whatever utility this concept might have in guiding the Act's other applications, the Texas Supreme Court has recently emphasized that, as with other statutes, the Act "'shall not be construed as a waiver of immunity unless the waiver is effected by clear and unambiguous language.'" The high court has likewise reminded us that it is the Legislature's sole prerogative as to whether, how, or to what extent to waive immunity under the Act and that both this principle and the immunity doctrines themselves are founded on judicial deference to legislative policy judgments regarding the appropriate use of Texas's governmental resources. In short, our analytical starting point is that immunity bars [Plaintiff's] suit against [Defendant], and whether it should be otherwise turns not on the Act's overarching policy goals, however salutary judges may perceive them to be, but solely on whether the Legislature has clearly and unambiguously waived immunity with respect to the facts [Plaintiff] has presented.

*Hunt Cty. Cmty. Supervision & Corr. Dep't v. Gaston*, 451 S.W.3d 410, 419 (Tex. App.—Austin 2014, pet. denied) (footnotes omitted).

The problem with *Rangel* is the same problem observed by the Third Court of Appeals in *Gaston*: undue emphasis and reliance on the remedial purpose of the Act. *See id*. In *Rangel*, the second commissioner allegedly misreported her income to obtain Section 8 housing and used her position as commissioner to facilitate approval of her application for higher benefits. *See Rangel*, 131 S.W.3d at 548. A statute considered by the court did not forbid the alleged wrongful act, but *Rangel* stated—rather indefinitely—that "the misconduct involved in the procurement of additional benefits which *could* fall within the official duties of a commissioner." *See id.* (emphasis added). To find the commissioner's act was an act of an "employing governmental entity," the *Rangel* court relied on *Johnson*'s dicta—related to the remedial goals of the Act and *italicized* below—to decide the second commissioner was acting in her official capacity when allegedly violating the law:

> ". . . [*Johnson v.*] *City of Cockrell Hill*, 48 S.W.3d at 890. The court found that the legal violations alleged to have been committed by the alderman did not *relate to the affairs of the City itself* and that *the actions were detrimental to the individuals involved, not to society in general. Id.* at 896. The court also decided that the alderman's actions were *not matters the public would be concerned about simply because of the alderman's status as an elected official. Id.* The facts here are distinguishable. [The second commissioner's] actions in misstating her income *were detrimental to society in general* and would be *the type of conduct the public would be concerned about if committed by an appointed commissioner of HACEP.* The governing board is charged with the authority to rent or lease housing to those with low income in accordance with authority guidelines. *See* TEX. LOC. GOV'T CODE ANN. § 392.005. *The misfeasance committed by [the second commissioner] clearly relates to the affairs of HACEP and was not merely detrimental to those parties involved. Society as a whole is detrimentally affected* by such a misrepresentation because deserving candidates may be turned

> away and denied housing. And *the public would be concerned* if one of HACEP's own commissioners fraudulently misrepresented her personal income in order to gain better housing because the commissioner holds her position as a tenant.
>
> We conclude that the actions of [the two commissioners] fall within the official duties and affairs of HACEP and their misconduct should be construed as acts of the employing governmental entity.

*Id*. The *Rangel* court mistakenly utilized *Johnson*'s judicial interlineation beyond the statute's text as a legal standard to determine that the second commissioner acted in her official capacity. *See Johnson*, 48 S.W.3d at 896; *see also* TEX. GOV'T CODE ANN. § 311.034 ("[A] statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language.").

*The majority's reliance on the Johnson dicta that was repeated in Rangel*

The majority states it agrees with *Johnson*'s and *Rangel*'s general approach to determine whether acts were done in Briggs's official capacity and relies on *Johnson*'s dicta to make the determination. Majority Op. at 18. For example, the majority parenthetically describes *Johnson* as "concluding alderman's alleged assault, sexual assault, and drug-related activities were actions taken in personal capacity and report about those actions was not protected under the Act, *when actions did not relate to affairs of the City itself, were detrimental primarily to the individuals involved, not to society in general, and were not things the public would be concerned about simply because of [his]status as an elected official.*" *See* Majority Op. at 18 (emphasis added). The majority also compares *Johnson* and

–14–

*Rangel* in terms of *Johnson*'s dicta concerning the remedial purpose of the Act.[6] As noted, *Johnson* stated its dicta only after already having appropriately concluded: "There is no allegation or evidence that [the alderman] committed any violation of the law in his official capacity as alderman." *See Johnson*, 48 S.W.3d at 895. I disagree with the majority's use of *Rangel* insofar as the majority and *Rangel* utilize *Johnson*'s dicta—concerning the remedial purpose of the Act—as a proxy for analyzing whether an official is acting in his or her official capacity.

The majority reaches two basic conclusions that Briggs was an "employing governmental entity"—each reliant on the dicta in *Johnson* and used in *Rangel*:

1. "Here, Briggs's alleged misconduct in providing information to DRC about the DEC could fall within her official duties of a city council member, at least insofar as it related to her votes regarding the DEC contracts"; and

2. "Moreover, her disclosure of confidential information about the DEC to DRC would be the type of conduct the public would be concerned about if committed by an appointed city council member as it could jeopardize pending or future contracts with the City or possibly expose the City to further liability."

*See* Majority Op. at 20. I address each in turn.

---

[6] The majority states: "In *Johnson*, our sister court reasoned that [the alderman's] alleged violations of law was not by the employing governmental entity because they did not relate to the affairs of the city itself, were detrimental primarily to the individuals involved, not to society in general, and were 'not things the public would be concerned about simply because of [the alderman's] status as an elected official.' *See Johnson*, 48 SW.3d at 895–97. In *Rangel*, our sister court reasoned that [the commissioner's] alleged violation of law was by the employing governmental entity because her alleged misconduct in procuring additional benefits could fall within the official duties of a commissioner and her misstatement of income would be the type of conduct the public would be concerned about if committed by an appointed official. *See Rangel,* at 547–48." *See* Majority Op. at 20.

–15–

First, the majority follows *Rangel* and states that Briggs's disclosure "could" have fallen within her official duties. *Rangel*'s "could" test is quite vague and can lead to an expansion of the Act's limited immunity. The majority's conclusion that Briggs's conduct "could fall" within her official duties is an application of this erroneous expansion. Second, the majority moves from "could" to the "related to" dicta stated in *Johnson* (and improperly applied in *Rangel*) as a standard to determine whether Briggs acted in her official capacity. Finally, the "related to" standard in *Rangel* judicially expands the Act's limited waiver of immunity beyond that enacted by the Legislature. The majority's adoption of *Rangel*'s "related to" standard—a broad standard, indeed—requires that future plaintiffs need only inconclusively posit that a complained-of act "could" fall within an elected official's duties and might be "related to" an official's function. The majority's continued expansion, suggested by *Rangel*, of the Act's limited waiver of immunity is error. Moreover, the majority apparently does not attach significant weight to evidence relating to official capacity, including: (1) evidence that Briggs acted without the knowledge, consent, approval, or ratification of any of the remaining council members or other government official; (2) evidence that Briggs's conduct was determined by the relevant city official to have been in conflict with and adverse to the interests of the City, or (3) other evidence, outlined above, that Briggs was not acting in her official capacity.

The majority's second basis for its decision, "possible public concern," is taken directly from *Johnson*'s dicta related to the remedial goals of the Act—not

from *Johnson's* previous determination whether the alderman there was acting in his official capacity. *See Johnson*, 48 S.W.3d at 896 (stating, "In short, they are not the things the public would be concerned about simply because of [the alderman's] status as an elected official."); *see also Rangel*, 131 S.W.3d at 548 (noting, "And the public would be concerned if . . . ."). I find the "possible public concern" test to be an extra-statutory, judicially created standard to determine whether the Act's limited waiver of sovereign immunity extends here.

Accordingly, I disagree with the majority's analysis insofar as it relies on *Johnson's* dicta, improperly relied on in *Rangel*, to determine that Briggs acted in her official capacity.

The majority's reliance on *Office of the Attorney General of Texas v. Brickman* also provides an unsupported judicial broadening of the Act's limited waiver of immunity. The majority quotes *Brickman* as stating *in light of the broad remedial nature of the Act*, "it seems reasonable to conclude that the legislature intended the statute to be more inclusive, sweeping up appointed officials whose bad acts might otherwise not fall within the ambit of the Act, rather than less." Majority Op. at 21 (quoting *Office of the Attorney Gen. of Tex. v. Brickman*, 636 S.W.3d 659, 673 n.15 (Tex. App.—Austin 2021, pet. pending)).

First, the two opinions cited in *Brickman* for support of the proposition do not suggest that the Act is properly applied in "sweeping up appointed officials whose bad acts might not otherwise fall within the ambit of the Act, rather than less." *See*

–17–

*Brickman*, 636 S.W.3d at 673 n.15 (citing *Tex. Dep't of Hum. Servs. v. Green*, 855 S.W.2d 136, 142 (Tex., App.—Austin 1993, writ denied) (superseded by statute on other grounds) (stating, "A liberal construction does not restrict the statute, but enlarges its scope and effect to effectuate the true legislative purpose."); *Castaneda v. Tex. Dep't of Agric.*, 831 S.W.2d 501, 503 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied) (same). *Green* simply refused to interpret the Act to limit a public employee's cause of action for retaliation to a suit against individual supervisors rather than against governmental entities. *Green,* 855 S.W.2d at 141. *Castaneda* refused to add text onto the Act, specifically the additional requirement that the whistleblower "initiate" a report. *Castaneda*, 831 S.W.2d at 503.

Second, *Brickman* and the majority opinion would sweep elected government officials who do not act in their "official capacity"—as with Briggs here—into the Act. Opinions relied on by the majority suggest this is not an intent behind the Act. *See Rangel*, 131 S.W.3d at 547 (noting that "acts outside the scope of an employee's official duties are not acts of the State."); *Johnson*, 48 S.W.3d at 895–96 ("[Whistleblower] has not directed us to any case, and our research has not revealed any, in which a court has held that an elected official is part of the employing governmental entity when he is acting in his private, rather than official, capacity. Instead, the cases to which the Act has been applied have involved legal violations committed by an official in the scope of the official's duties, or by a public employee.").

Last, *Brickman* contradicts Texas law. How does a legislature *intend* a statute to sweep up defendants *who do not fall within the ambit of the statute*? *See* TEX. GOV'T CODE ANN. § 311.034 ("[A] statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language."); *Johnson*, 48 S.W.3d at 896 ("[L]egislative consent to suit must be by clear and unambiguous language. There is nothing in the plain language of the Act that would indicate clear legislative intent to waive sovereign immunity from suit based on the private acts of elected officials.").

The Court should not adopt *Brickman*'s judicial expansion of the Legislature's limited waiver of sovereign immunity provided by the Act.

\* \* \*

In sum, I would hold as a matter of law that Briggs did not act in her official capacity at the time she gave the information to the *Denton Record-Chronicle*. She was not acting as the City when doing so. Hence, Briggs was not an "employing governmental entity" under the Act. The Act cannot be construed to clearly and unambiguously provide its considered and limited waiver of immunity based on Keely Briggs's personal conduct. I would dismiss appellees' lawsuit.

### But-For Causation

If the Act applied here, I would dissent due to the majority's refusal to apply controlling precedent of the Texas Supreme Court, *Office of the Attorney General of Texas v. Rodriguez*, 605 S.W.3d 183 (Tex. 2020).

–19–

The majority asserts, "We find *Rodriguez* to be distinguishable from the circumstances here." *See* Majority Op. at 32. The majority distinguishes *Rodriguez*, in part, because: "The difference here is that the two people, Leal and Collister, who initiated the investigation into the procurement process even after the city council previously found no issues, did know about appellees' report as they were assistant city attorneys and were involved in handling the reported violation and reviewing documents Briggs disclosed to the newspaper. It was these reported investigations into appellees that led to Langley's decision to fire them." Majority Op. at 32.

But *Rodriguez* provides:

> In determining causation, we focus on those with authority in the decision-making process that resulted in the adverse employment action and whether there is evidence "that the decisionmaker or decision-makers" acted with a retaliatory motive. Evidence of one decisionmaker's improper motive, however, cannot be imputed to all of the decisionmakers—or to the final decision—without evidence that the improper motive influenced the final decision.

*Rodriguez*, 605 S.W.3d at 193.

The facts the majority uses to distinguish *Rodriguez* directly implicate *Rodriguez*. There is evidence that Deputy City Manager Langley and City Manager Hileman were decisionmakers in terminating appellees' employment. There is no evidence that Langley or Hileman acted with retaliatory motive. There is no evidence of improper motive concerning City Attorney Leal or Assistant City Attorney Collister. Even if Leal or Collister harbored a retaliatory motive, such motive could not be imputed to decisionmakers Langley and Hileman—or to their

final decision to terminate appellees' employment—without evidence that the improper motive influenced the final decision. *See id*. There is no such evidence. *Rodriguez* demands evidence, not speculation, surmise, or suspicion. Nor is there other circumstantial evidence of but-for causation. *See id.* at 192–93 (citing *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 (Tex. 2000) (noting circumstantial evidence may show a retaliatory motive when it demonstrates: (1) knowledge of the report of illegal conduct, (2) expression of a negative attitude toward the employee's report of the conduct, (3) failure to adhere to established company policies regarding employment decisions, (4) discriminatory treatment in comparison to similarly situated employees, and (5) evidence that the stated reason for the adverse employment action was false.)).

The majority also distinguishes *Rodriguez* because appellees' employment was terminated for conduct occurring after their report. Majority Op. at 32. *But see id.* at 196 ("The Whistleblower Act does not prohibit employers from terminating an employee based on conduct that arises after the employee reports a legal violation.").

Accordingly, I would dismiss this case because the Act does not apply.

Alternatively, if the Act applied, I would reverse the trial court's judgment and render judgment for the City because *Rodriguez* demonstrates there is insufficient evidence of but–for causation.


/Bill Pedersen, III/
BILL PEDERSEN, III
JUSTICE


200945DF.P05